## A. W. BROWN v. W. D. ANDREWS.[1]

December 1, 1911.

Nos. 17,273—(109).

**Fraudulent representations — questions for jury — evidence — rule of damages — new trial.**

In this, an action to recover damages for fraudulent representations in the sale of mining stock, it is *held:*

1. That whether the representations were made, were false, and made with intent to defraud were questions for the jury, and the verdict for plaintiff is sustained by the evidence.

[1] Reported in 133 N. W. 568.

2. The representations were not merely naked assertions of value, made by a vendor to a vendee, but were representations of material facts.

3. Whether plaintiff relied on the representations was a question for the jury, and the evidence sustains the verdict on this point.

4. The evidence does not conclusively show that plaintiff knew the representations were false at the time he bought the stock.

5. The trial court instructed the jury that plaintiff was entitled to recover the amount paid for the stock with interest, or nothing. This is an erroneous application of the rule of damages, but the attention of the court was not called to the error on the trial, and no exception was there taken to the instruction. *Held* that, in view of the course of the trial, it was the duty of counsel to call the court's attention to the instruction, if deemed inaccurate or unsatisfactory to defendant, and that, failing to do so, the error cannot be made ground for a new trial.

6. There was no prejudicial error in the rulings on the admission of evidence, in the instructions given, or in the refusal to give instructions requested.

Action in the district court for Hennepin county to recover $5,200 for alleged fraudulent representations in the sale of mining stock. The case was tried before Steele, J., and a jury which returned a verdict in favor of plaintiff for $3,515. From an order denying defendant's alternative motion for judgment notwithstanding the verdict or for a new trial, he appealed. Affirmed.

*James A. Peterson,* for appellant.

*Fred B. Phillips,* for respondent.

Bunn, J.

Plaintiff brought this action to recover damages which he claimed to have suffered by reason of false and fraudulent representations of defendant which induced plaintiff to purchase stock in the "Bonnie Brae Mining Company."

The complaint alleged that defendant was the promoter and organizer of the company, and represented to plaintiff "that he had personally invested a small fortune in getting control of this property" and that the corporation had paid $18,000 for the property, and had invested several thousand dollars in developing the same. It was alleged that these and other representations were false, and made

with the intent to defraud plaintiff; that in fact the mines were worthless, and the corporation insolvent. The answer admitted that defendant, together with E. B. Multer and V. E. Carlson, residents of Los Angeles, California, organized the mining company, and that plaintiff purchased stock in the company after examining the mines and procuring assays of samples of ore. Fraud was denied.

The trial resulted in a verdict for plaintiff for $3,515. Defendant's motion for judgment notwithstanding the verdict or for a new trial was denied, and he appealed.

The first question is whether the evidence is sufficient to sustain a verdict in plaintiff's favor. The evidence of plaintiff and his witnesses tended to show the following facts:

Plaintiff and defendant first met on a train in New Mexico in December, 1907. They, with their wives, traveled together in Texas, and Mexico, and went to Los Angeles, where they rented apartments and lived together for two months. In February, 1908, plaintiff and defendant took a trip into Nevada to look into a "leasing proposition;" plaintiff having money that he wished to invest. Plaintiff decided not to invest in Nevada; defendant discouraging everything they saw. On the return trip, defendant mentioned the fact that his brother-in-law, Carlson, a good judge of mining properties, was about to make a deal for a bunch of claims in Arizona, which he considered very reasonable and very good.

After their return to Los Angeles, defendant stated to plaintiff that Multer had bought these claims from the Youngs for $12,000, and that defendant and Carlson were negotiating to buy the claims from Multer for $18,000; that they were incorporating a company, and in view of the fact that plaintiff and defendant had traveled together all winter, he would let plaintiff in just the same as he got in—that is, plaintiff could have two hundred thousand shares of the stock for $6,000. Plaintiff was shown the contract for the claims that Multer had, in which the consideration was named at $12,000, $7,000 of which was recited as paid in cash, the balance to be paid at the rate of $1,000 every three months. Defendant represented that he had paid $1,000 in cash on account of his stock and had given his note for $5,000 for the balance, and Carlson, at defend-

ant's request, showed plaintiff the note. The evidence of Multer was that the consideration in the contract was named at $12,000 at the request of defendant and Carlson, and in order to deceive plaintiff. The fact was that the total purchase price for the claims was $5,000, none of which had been paid. Defendant had not put in any cash, except that he and Carlson paid for incorporating the company. The note which was exhibited to plaintiff was afterwards returned to defendant. Neither Carlson nor Multer paid anything.

Plaintiff testified that he believed these representations, but that he was unwilling to invest until he had examined the claims. He and defendant then took a trip to Arizona to examine the claims.

On the way, apparently by accident, they met Young, a mining engineer, who was interested in mines that adjoined these, and from whom and his associates Multer had bought the claims in question. Young, abandoning his own business, went with plaintiff and defendant, and together they inspected the claims, took samples of ore, and returned to Los Angeles, where the samples were assayed and showed surprising value. Plaintiff soon thereafter bought one hundred thousand shares of the stock of the company, which had been organized in the meantime, paying $3,000 to the treasurer. Defendant was president of the company, his brother-in-law, Carlson, secretary-treasurer, and Multer vice president. Plaintiff, soon after he became a stockholder, was elected a director.

Multer, as soon as plaintiff's money was secured, started for the mines, having been made superintendent. He erected buildings, bought machinery and tools, and did some development work. He remained at the mines until early in 1910. Before this time he had ceased to act for the company; the money for his salary and for exploiting the mines not being forthcoming. He brought suit, attached and sold the personal property, and relocated in behalf of his son and himself certain of the mines. The claims were not patented, and it was necessary in order to hold them to do a certain amount of work on them each year. No work was done during the year 1910.

Plaintiff, after his purchase of stock, returned to Minnesota, where he endeavored to sell stock in the company, but without success. His

letters indicate his faith in the mine, and a wish to interest others in order to raise money for development. Defendant denied any fraudulent representations. His evidence and that of his witnesses tended to show that both he and plaintiff invested in the stock in reliance upon the statements of the Youngs, Multer, and Carlson, and upon their own examination of the claims and the assays.

Our conclusions from the whole evidence are as follows:

1. The evidence was conflicting, and it was a fair question for the jury as to whether defendant, with Multer and Carlson, fraudulently conspired to obtain plaintiff's money. The evidence sustains a finding that representations as to the amount that Multer had paid the Youngs for the claims, as to the sum that the company was paying Multer for them, and as to the cash invested by defendant and Carlson, were made, and that they were false, to the knowledge of defendant.

2. These representations were more than mere statements by a vendor as to the value of the property, or as to its cost. They were representations of material facts, made with the intent to induce plaintiff to part with his money. It is true, generally speaking, that naked assertions of value, though shown to be false, are not a ground for action as between vendor and vendee. But an assertion that a given article of property is of a certain value, or that it cost so much, is not always a mere opinion. It depends upon the relations of the parties and the surrounding circumstances.

That the mining claims had been bought by Multer from the Youngs for $12,000, and by the company from Multer for $18,000, were representations well calculated to make plaintiff believe that the property was very valuable. The statement that Carlson, an experienced mine promoter, had invested $6,000, and that defendant, plaintiff's friend and traveling companion, had put in a like sum, were not naked assertions of value, but representations of fact. The pains taken to prove to plaintiff that these statements were true, by exhibiting to him the documents, shows that the parties considered the facts of importance. The remarkable coincidence of the meeting with Young, the experienced miner, on the trip to

Arizona, his ready assent to abandon his own business, which he was taking the long trip to attend to, and to spend his time instead in selecting samples of ore with plaintiff and defendant, and in procuring the wonderful assays of the samples, are circumstances that help to indicate the character of the representations made.

3. Defendant insists that plaintiff did not rely on the representations made, but on his own examination of the property. We think this question was for the jury, and that the evidence sustains the verdict on this point. That plaintiff was unwilling to part with his money until he had examined the mines and procured assays does not conclusively indicate that he did not rely on the representations. He testified that he did, and there is at least a strong suspicion that his knowledge gained on the visit to the mines was in the nature of further false representations. It is clear that an examination could tell nothing to one of his experience. It is, of course, the law that an action for deceit will not lie unless there is evidence that the injured party believed and relied upon the false representations. And where there is full opportunity to investigate, and discover the truth of the representations, and such an investigation is made, it shows that the representations were not relied on. But where there is not opportunity to investigate and discover the falsity of the representations, or where an investigation will not disclose their falsity, the fact that the victim attempts to verify the representations by an investigation does not defeat his action. We are not prepared to hold as a matter of law that the purchaser of mining stock is not entitled to rely on any representations made to him by the seller and buys at his peril. While the purchaser clearly has no right to rely on exaggerated estimates of present or future value, or the promises of fortunes to the stockholders usually held out, it cannot be said that he may not rely on material representations of fact. And unless it conclusively appears that the purchaser either had no right to rely on the representations, or in fact did not rely on them, the question is for the jury.

4. Defendant urges that the evidence conclusively shows that plaintiff knew that neither defendant nor Carlson had paid cash for their stock, but that it was "promotion" stock. There is evidence

to indicate that plaintiff knew this after he had purchased his stock, but it is by no means conclusive that he knew it at the time he made his investment. It is not fatal to plaintiff's right to recover that he discovered the falsity of some of the representations after he parted with his money, or that he endeavored himself to sell stock in the company. This is not an action to rescind, but an action to recover damages.

5. The instruction of the trial court to the jury that plaintiff was entitled to a verdict for $3,000, with interest, or nothing, presents a serious question. Undoubtedly the measure of damages was the difference between what plaintiff parted with and the value of what he received at the time of the transaction. Plaintiff testified that the stock was worthless, and this was probably true at the time of the trial. The evidence showed that the mines had been lost to the company. Of course, the stock had no market value at any time. This is true generally of mining stocks that are not on the market, but it does not follow that they have no actual value. While it is true that in the record before us there appears testimony that the claims were worth $20,000 at the time plaintiff bought his stock, this evidence, given in the depositions of the two Youngs and Carlson, is materially weakened by the fact that the Youngs had just sold the claims to Multer on his promise to pay $5,000. The samples afterwards taken by defendant and assayed showed no value. But we cannot say that it conclusively appeared that plaintiff's stock was without any value at the time he bought it.

However, the question of the rule of damages was not mentioned during the trial, no instruction was requested on this point, and after the court had told the jury that the verdict should be for $3,000 or nothing, its attention was not called to the statement, and no exception was taken until the motion for a new trial was made. It seems probable that the trial court assumed, from the whole course of the trial, that there was no issue on the rule of damages, and that the instruction here complained of was not due to an erroneous conception of the law, but was more in the nature of an inadvertence.

The statute permitting exceptions to the charge to be postponed

until the motion for a new trial does not permit litigants to single out after the trial isolated portions of the charge, and secure a new trial for some technical error or mistake, which could have been corrected, had attention been called to it at the trial. While this rule, first adopted in Steinbauer v. Stone, 85 Minn. 274, 88 N. W. 754, does not apply to instructions on a controlling proposition of law, it seems just to apply it to the erroneous instruction in this case. Mountain v. Day, 91 Minn. 249, 97 N. W. 883.

6. The assignments of error not already covered by this opinion may be grouped and disposed of as follows:

(a) Assignments of error in overruling objections to leading questions. There was no abuse of discretion in these rulings, and prejudice does not appear.

(b) Permitting plaintiff's attorney, on the cross-examination of defendant, to read questions and answers from the deposition of a witness for plaintiff, and to ask defendant if such answers were true. This practice is not to be commended, but we discover no prejudice to defendant.

(c) Permitting cross-examination of defendant on matters not touched on in the examination in chief, and on collateral matters. There was no error here.

(d) Overruling objections to certain alleged hearsay evidence. The rulings, if technically erroneous, were not prejudicial to defendant.

(e) Compelling defendant to answer a certain question by yes or no. There is no merit in this assignment.

(f) Remarks of counsel in his argument to the jury. We find no ground of criticism here.

(g) Alleged errors in the charge. There are no errors in the charge as given that do not fairly come in the class of those omissions to instruct, and verbal inaccuracies to which it is the duty of counsel to call the attention of the court at the trial. Steinbauer v. Stone, 85 Minn. 274, 88 N. W. 754; Applebee v. Perry, 87 Minn. 242, 91 N. W. 893.

(h) The instruction that the jury might include in its verdict certain amounts expended by plaintiff for hotel bills and railroad

fare. This is a purely moot question here, as it is clear that the verdict included only the $3,000, and interest.

(i) We find no reversible error in the refusal to give instructions requested by defendant.

On the whole record we conclude that the questions of fact were peculiarly for the jury, and not for the court, to decide; that the verdict is fairly sustained by the evidence, and should not be disturbed by this court after the trial court has approved it; that the trial was fair; and that there were no prejudicial errors.

Order affirmed.