HENRY FAUST, Appellant, v. CLIFTON M. PARKER et al., Appellees.

**FRAUD:** **Fraudulent Representations—Essential Elements.** A jury question is presented by testimony which tends to show that defendants, with the intent to defraud, falsely represented the value and ownership of corporate stock and its great desirability as an investment, and that the victim thereof justifiably relied thereon to his damage.

**TRIAL:** **Direction of Verdict—Isolated Testimony.** In ruling upon a motion for a directed verdict, the court should not look alone to some isolated statement in the testimony of a witness, but should treat it as a whole. (See Book of Anno., Vol. 1, Sec. 11508, Anno. 52 *et seq.*)

**FRAUD:** **False Promise—When Actionable.** The deliberate making of a promise to resell corporate stock which was being offered for sale, with the intent to defraud, and with no intention of performing such promise, matures a cause of action in one who justifiably relies thereon to his damage.

**FRAUD:** **Advice—When Fraudulent.** One who is sought out as an adviser in a contemplated purchase, and gives such advice fraudulently, and with the intent to defraud and to promote his own secret, but concealed, interest in the transaction, must respond in damages to the one who justifiably relies thereon.

Headnote 1: 12 C. J. p. 645. Headnote 2: 27 C. J. p. 73. Headnote 3: 26 C. J. p. 1094. Headnote 4: 26 C. J. p. 1161.

Headnote 1: 12 R. C. L. 240.

*Appeal from Chickasaw District Court.*—JAMES D. COONEY, Judge.

MAY 10, 1927.

REHEARING DENIED. OCTOBER 1, 1927.

An action to recover damages, based on fraud and conspiracy. From a directed verdict in favor of all of the defendants plaintiff appeals.—*Reversed in part; affirmed in part.*

*Hurd, Lenehan, Smith & O'Connor,* for appellant.

*Mears & Lovejoy* and *Condon & Clary,* for appellees.

ALBERT, J.—Generally speaking, the claim of the plaintiff is that the defendants conspired together to defraud him by inducing him to purchase corporation stock of the North American Fire Insurance Company. It is alleged,

1. FRAUD: fraudulent representations: essential elements.

*inter alia,* that the defendants falsely represented to the plaintiff that the stock offered to him belonged to the North American Insurance Company; that its value was equal to or in excess of the amount demanded for it, and that it would be a safe and profitable investment for the plaintiff; that the defendants could and would resell said stock for plaintiff at a profit before Christmas of that year (1919); that the stock sold to him at $250 a share (par value $100) would be resold for $300 a share, and that the same was worth that price; that plaintiff was without knowledge of the affairs of the insurance company, and ignorant of stock values; that he relied upon the advice of the three defendants, and purchased 200 shares of stock at $250 a share; that he was ignorant of the fact that Parker and Himes and the First National Bank of Lawler were interested in said transaction; that he accepted and acted upon their advice, supposing they were disinterested. He alleges that all of said statements and representations were false, and known to be false by the defendants; that said statements were made to deceive and defraud the plaintiff; that said stock was not the property of the said insurance company; that the defendants, Parker and Himes and the First National Bank of Lawler, were in fact financially and secretly interested in the consummation of the transaction; and that said defendants were to and did receive compensation for their part in inducing the plaintiff to enter into and to consummate the deal and in executing cer-

tain promissory notes and mortgages; that said stock was not worth $250 a share, but was worthless; that said defendants have not resold said stock, as they represented they would; and that said representations were made with no intention of re-selling, but knowing that said stock could not be so resold; that by reason of these facts the plaintiff has been defrauded by the defendants in the sum of $50,000.

Parker, Himes, and the bank filed answer, which, so far as the matter now stands before the court, is a general denial. Each of the three defendants filed separate motions to direct verdicts in their favor, at the end of plaintiff's testimony, which motions were separately sustained. As to the First National Bank of Lawler, we have scanned this record with care, and are unable to find any evidence to support the plaintiff's allegation in its charge and claim against said bank. It must, therefore, follow that the ruling of the court in sustaining its separate motion to direct was proper.

As to the motions of Parker and Himes, however, we do not reach the same conclusion. We cannot, of course, set out all of the evidence in the record which leads us to this con-clusion, but there is evidence in the record from which the jury could find the following facts: Faust, the plaintiff, was a man 69 years of age, living on a farm in Chickasaw County, about 4 miles from the town of Lawler, and an equal distance from the town of Waucoma, in Fayette County. He, together with a brother and a sister, moved there when he was about two years of age, and has lived there ever since. None of the three seem to have been married, and the brother died some years ago. They were uneducated, but seem to have been hard-working people, and by their industry accumulated some property. Faust had some business experience, at one time being con-nected with a small bank at Waucoma, occupying the position of vice president, and also a member of the examining com-mittee, in which capacity he helped to make reports to the state, from time to time, of the condition of the bank. It was with this bank that he transacted most of his banking business, al-though on one or two occasions he transacted business with the First National Bank of Lawler. In July, 1919, he was approached by one T. R. Jump, a high-pressure stock salesman, who at-tempted to sell him stock in the aforesaid fire insurance com-

pany. The plaintiff refused to buy, although it was represented by Jump that he had been sent to see plaintiff by the defendant Parker, who was president of the First National Bank of Lawler. Plaintiff, at the solicitation of Jump, went to Lawler, to interview Parker and to obtain his advice as to whether or not he should invest in this stock. When they reached Lawler, Parker was not present, but there was some talk with the assistant cashier, Alva Clapham. They waited for Parker's return. Parker, Jump, and plaintiff had a conversation in the bank. Plaintiff told Parker that he would not purchase said stock unless advised so to do by him (Parker). Parker said that it was all right, and that this man Jump was all right, and that the company and the stock were all right, and it was a good investment. Jump said that he would resell the stock for $300 a share before the notes became due. They all said it was a good investment. Acting and relying upon Parker's advice, plaintiff signed $25,000 in notes for 100 shares of said stock, and these notes were turned over to Parker. Plaintiff testified:

"I said I knew nothing about this stock, and told Parker that this man Jump wanted to sell me this stock, and that I would not buy from him, however, unless or until I saw Parker and got his advice on it; and Parker said it was all right."

This transaction occurred on the 16th of July, 1919. About the 29th day of July, 1919, another salesman of this line of stock, one W. L. Harvey, appeared at the plaintiff's premises, and sought to sell him more stock in this company. Plaintiff accompanied Harvey to Lawler, and there again met Parker, to whom he said:

"Here is this man Harvey, trying to sell me more of that North American Fire Insurance Company stock, and I don't want to buy it. I have already signed notes to Jump, and unless the stock is resold I will be ruined."

He testifies:

"Parker said: 'Is that so? I always thought you had money.' I said, 'Of course you say the stock is all right, but I cannot buy it.' He said: 'The stock is all right. I wish I could afford to buy $50,000 worth of it.' Harvey said: 'I will resell this stuff for you. You will never have to pay for it. We will take your note, and you will never have to pay it. We will resell it before your notes become due next Christmas.' Parker

said: 'I don't know if you can resell it. You will have to take a chance on reselling the note, unless I get security for it.' Parker said he wanted security for that $10,000, and he said: 'You can sign up; you sign these papers today, and we can make out the security tomorrow. I will hold them until you come in.' I told Parker that I relied upon what he told me about this. I relied on that he would see to it that it was resold.''

Plaintiff signed notes for $25,000 for, a second 100 shares of stock. Two days later, Parker and Himes went to plaintiff's residence and presented him with mortgages and notes, which were objected to by plaintiff on the ground that they did not comply with the talk on the previous day, as they had added to the mortgages the notes given in the Jump transaction. Parker again represented to the plaintiff that the stock would be resold, and plaintiff said to them: "My father said to me never to mortgage my place, but when you guarantee this stuff to be sold, I will sign these papers." They both then said, "That's all right." Plaintiff then signed the new notes and mortgages for $20,000. Of these two mortgages, one was for $15,000 on the home place, and one for $5,000 on Fayette County land. At this time, plaintiff did not know that Parker and Himes had any interest, commission, or discount in said notes. Later on, the first notes signed by the plaintiff were returned to him.

On cross-examination, plaintiff testified:

"When Jump came to see me, I told him I would have nothing to do with him until I got Parker's advice. I generally know what I am doing, but this time I depended upon Parker. He talked to me about stock, and I thought he knew about stock. He mentioned insurance and cement stock, etc. I didn't rely upon the statement that they would resell it for me at an advance. I never would have signed it if they had not told me that Parker had sent them there and that Parker would tell me it was all right. I never would have taken their word for it. That is why I would not sign up anything until I saw Parker. Parker said to Harvey: 'I don't know that you can resell it. You will have to take your chances on reselling the note, unless I get security for it.' As to the stock, Parker said he didn't know whether they could resell it or not. He didn't say that to me. He said it to Harvey, but I heard it. I

knew, when Parker made that remark, that he had some doubt as to whether they would be able to resell it. That is why I said I would not buy any. I would not have bought the stock at all if I had not believed in their ability to resell. I would not have bought any, if it was not that Parker was right there, and I had confidence in Parker that, if there was anything doubtful about it, he would stop and say, 'No more to do with it.' I didn't want to buy it until Parker told me to sign for that stock. Parker said, 'Very well; sign these papers today and come in tomorrow and give me security.' When I said I was always willing to give security in an honest transaction, Parker said, 'Then you can sign up these papers; come in tomorrow and give security.' Parker advised me to buy it after he told Harvey that he doubted his ability to sell the stock within the time stated. He further said to Harvey: 'I don't know whether you can resell it in that time or not. You will have to take many chances on selling this note. I won't take it unless I get security.' "

He further testified:

"During the year 1919 I bought $160,000 worth of stock from agents. I certainly have been greatly deceived and defrauded in these agents who sold me these things. I would not have bought the North American Fire Insurance Company's stock at all if the notes would not have gone through Parker's hands, so he could tell me whether the transaction was a proper one or not. Of the $50,000 worth of stock I bought in the North American Fire Insurance Company, $20,000 of it was represented by mortgages and $30,000 by deferred notes. I have never paid anything on the deferred notes. The two mortgages are now held by Father Ryan and Mrs. Buckholz, and they are now demanding payment thereon. Demand is now being made on me to pay one of the $15,000 notes which is held by the Des Moines National Bank."

At another place in his testimony, plaintiff says:

"I was induced to sign these subscription notes by the promise of resale."

There is evidence that Parker and Himes were interested in these sales of stock to the plaintiff, and received in all $4,500 from the proceeds thereof, which was divided between them. There was other evidence from which it could be found that

the stock sold to plaintiff was not ·stock belonging to the insur-
ance company, but was stock which had been bought by other
agents of the· company and was being resold for those agents.
There is also evidence from which it could be inferred that the
defendants had no ·intention of reselling the stock at ·the time
they represented that they could and would sell it; also that
Parker and Himes and the agents of the insurance company
confederated together to sell this stock to the plaintiff; that the
stock was of little or no value; that it was not a good or profit-
able investment for the plaintiff; and that plaintiff relied upon
what Parker. told him about the stock and the company. · In
short, the evidence introduced in the case is such that a jury
might have found that the statements and representations were
made by the defendants and the agents of the company to the
plaintiff as alleged by him; also, there is evidence from which
the jury might have found that said statements were false and
fraudulent, and that the plaintiff relied upon them and acted
to his prejudice. As to the promise or agreement that the de-
fendants could and would resell said stock at an advance over
the purchase price, this was made without any· intention what-
ever on the part of the defendants to resell said stock for plain-
tiff. There is further evidence from which the jury could ·have
found that the said statements were made by the defendants,
knowing of their falsity, and with intent to defraud the plain-
tiff. With this state of the record, we are abundantly satisfied
that the court erred in directing a verdict in favor of Parker
and Himes.

The appellees argue strenuously that, because appellant at
one place in the examination stated that he was induced to buy
the stock by the agreement of the other parties that they would
resell the same, he therefore had no ·cause of
2. TRIAL: direc-
tion of verdict:
isolated testi-
mony.
action, and motion to direct .a verdict was
proper. A careful reading of the record, how-
ever, shows that, at other places in ·the record,
appellant states that he acted and relied upon the statements
made to him by Parker, aside from the promise to resell. While
there is some conflict in plaintiff's testimony on this question, it
is not fair that ·one statement made by appellant should ·be
segregated ·from all others and made the basis of a motion to
direct. His testimony should all be taken together, and from

whatever conflict there is therein it is for the jury to determine which of the statements are correct.

We are quite familiar with the rule of the cases cited by appellees that, generally speaking, a promise to do certain things in the future cannot be made the basis of an action in deceit; but we are equally familiar with the exception to that rule that, where such promise is made with intent to defraud, and the promisor has no intention whatever at the time to perform the promise, then it may be made the basis of an action in deceit. In the case of City Deposit Bank v. Green, 138 Iowa 156, in discussing this question, we said:

3. FRAUD: false promise: when actionable.

"In the case at bar the agent had caused the three persons to sign a subscription paper which was well calculated to deceive the defendants into the belief that they were to participate in the purchase, and would sign notes; so that, when the agent represented that they would so sign, the defendants quite readily acted in reliance thereon. But according to the evidence, the agent then knew this was not true, and had no intention of procuring their signatures. This was not only a false representation of his own intention, but a concealment of the existing purpose of the three subscribers not to sign, as well, and amounted to an actionable fraud."

See, also, Hobaica v. Byrne, 216 App. Div. 307 (214 N. Y. Supp. 759); Adams v. Gillig, 199 N. Y. 314 (92 N. E. 670); Troxler v. Building Co., 137 N. C. 51 (49 S. E. 58), where it is said:

"The fraud consists in the fact found by the jury that the defendants, at the time of making the representation and promise which constituted the inducement to make the deed, did not intend to make good such representation and promise."

In King v. Wise (Tex. Com. App.), 282 S. W. 570, it is said:

"The misrepresentation may appropriately take the guise of a promise to do, or to refrain from doing, something in the future, thus importing a declaration of present intent in accord with the promise; whereas the real intent (the fact) was not to do the thing promised, or was to do the thing whose omission was promised. In such a case there is actionable fraud if the

fact thus misrepresented be material, and was relied upon by the other party to his injury."

In *Clem v. Evans* (Tex. Civ. App.), 286 S. W. 273, it is said:

"It will be noted that appellee grounds his action of fraud on a failure to fulfill a future promise. It may be stated, generally, that an unfulfilled promise to perform an act in the future will not amount to legal fraud, notwithstanding such promise may have been the inducement for the execution of the contract. Our courts, however, recognize an exception to this rule in cases where it is made to appear that the promisor had no intention, at the time the promise was made, to fulfill it, and made such promise for the fraudulent purpose of inducing the contract."

See, also, *Donaldson v. Farwell*, 93 U. S. 631 (23 L. Ed. 993); *Goodwin v. Horne*, 60 N. H. 485; *Blackburn v. Morrison*, 29 Okla. 510 (118 Pac. 402); 26 Corpus Juris 1093.

Under this rule, although the false promises were to do something in the future, yet, if the intention existed in the mind of the promisor at the time he made it that he never would carry out such promise, then the same is a basis for an action in deceit. The facts in this case are such that the jury could have concluded from the whole record that, at the time the promise was made to resell this stock, the defendants had no intention whatever to perform the promise. This being true, there was a question of fact for the jury to determine, and hence the directing of a verdict in favor of the defendants was error. There was enough evidence in the record to take the other alleged false promises and representations to the jury. Further than this, we are of the opinion that, when the plaintiff went to Parker for advice as to what he should do in this matter, and whether or not he should purchase this stock, there was a duty upon Parker either to refuse to advise him, or, if he did attempt to advise him, to do so in good faith, because of the confidence reposed in him by the plaintiff. And under such circumstances, the concealment by Parker of the fact that he had a secret advantage in the transaction is fraudulent. *King v. White*, 119 Ala. 429 (24 So. 710); *Brown v. Andrews*, 116 Minn. 150 (133 N. W. 568); *Paddock v. Bray*, 40 Tex. Civ. App. 226 (88 S. W. 419); *Bunn*

4. FRAUD: advice: when fraudulent.

*v. Schnellbacher,* 163 Ill. 328 (45 N. E. 227) ; *North American Acc. Ins. Co. v. Miller* (Tex. Civ. App.), 193 S. W. 750; *Wustrack v. Hall,* 95 Neb. 384 (145 N. W. 835) ; *Hawkes v. Lackey,* 207 Mass. 424 (93 N. E. 828).

Another rule equally applicable here is that, where one assumes to act as a disinterested adviser, and makes statements either of fact or of opinion, having in fact a secret interest in the transaction, such representations are actionable. *Shaw v. Forsyth,* 226 Mass. 365 (115 N. E. 486) ; *Kenner v. Harding,* 85 Ill. 264 (28 Am. Rep. 615) ; *Busterud v. Farrington,* 36 Minn. 320 (31 N. W. 360) ; *Chellis v. Cole,* 116 Me. 283 (101 Atl. 444) ; 26 Corpus Juris 1161. There may be a joint liability existing where the wrong done is by concerted action and common intent and purpose, without proof of conspiracy. That such is our rule, see *Young v. Gormley,* 119 Iowa 546; *Hinkley. v. Sac Oil & Pipe Line Co.,* 132 Iowa 396 ; *Aughey v. Windrem,* 137 Iowa 315; *Moore v. Fryman,* 154 Iowa 534. That under a charge of conspiracy, a judgment may be entered against some of the parties charged, without holding all, is settled in this state. *Young v. Gormley,* supra; *Heisler v. Heisler,* 151 Iowa 503.

It is our conclusion that, upon the whole record, the plaintiff made a case for the jury, and therefore that, as to the defendants Parker and Himes, the court erred in directing a verdict for each of them.

In the trial of the case, plaintiff offered the corporation books of the insurance company, for the purpose, presumably, of establishing its financial condition, and also for the purpose of tracing the proceeds of the sale of this stock into the hands of Parker and Himes. We have not the books before us, and, of course, are unable to determine what they showed; but presumably the offer was made in good faith, and, if the books contained anything to support these propositions, or to support any other matters involved in this transaction, they should have been admitted, after having been properly identified. It was sought to show by witnesses what the books contained as to certain matters; and while, as a matter of convenience, their testimony would have probably saved time, at the same time, the books were the best evidence. The evidence introduced in

the trial below was not a sufficient identification of these books to allow them to be introduced in evidence.

It was also sought to show by the books that a certain part of "Series B" stock (the stock sold to plaintiff) had, prior to the time in controversy, been sold to certain of the agents of the company. If the books showed this condition of affairs, on proper identification they were certainly admissible in evidence.

Some other matters are discussed, but, as they are not likely to arise on a retrial of the case, we do not give them further attention.

For the errors pointed out, the case is reversed as to Parker and Himes, and affirmed as to the First National Bank of Lawler.—*Reversed in part; affirmed in part.*

EVANS, C. J., and DE GRAFF and MORLING, JJ., concur.