AMEIL WEBER, appellant, v. GEORGE PAUL et al., appellees.

No. 47526.

(Reported in 40 N.W. 2d 8)

DECEMBER 13, 1949.

Volney Diltz, of Des Moines, and W. W. Bulman, of Chariton, for appellant.

Roy L. Pell and Joe B. Tye, both of Marshalltown, for appellees.

HALE, J.—The petition of the plaintiff alleged a conspiracy, unity of action, the purpose of which was to force and compel plaintiff to cancel the judgment which plaintiff, as administrator of his mother's estate had recovered against defendant W. H. Weber in the district court of Jasper County, in an action brought under the direction of said court. The petition alleged assault and battery, and imprisonment, alleged the wilfullness of such overt acts and alleged such acts were wilfully and maliciously done in concert of action; alleged the damage to plaintiff and asked actual damages and also for exemplary damages.

Defendants deny the allegations of the petition and state that they, with other persons, did on September 6, 1945, at the request of Merle Weber, an incompetent brother of the plaintiff, accompany him to the house occupied by the plaintiff for the purpose of reasoning with the plaintiff and to beseech him to refrain from future mistreatment of said Merle Weber, of which they had been informed, and were also informed of threats made by the plaintiff to do the said Merle Weber physical harm, which information they believed after seeing the condition of said Merle Weber, and that they believed that as a humanitarian and neighborly act they could prevail upon Ameil Weber to discontinue such treatment; that they went to the house with the intent to talk to plaintiff and to request him to allow Merle Weber to return to his home; that before they had time or opportunity to make their mission known the said Ameil Weber reached into his hip pocket and pulled out a loaded revolver, and that two

of the defendants in self-defense took hold of the arms of said Ameil Weber and held him while he was disarmed by another of the defendants; that thereupon defendants let loose of the plaintiff and thereafter no one of these defendants or any other person touched him. The defendants and each of them admit that on the occasion when they were there on the premises they remained at the request of the plaintiff for approximately an hour until the arrival of the sheriff and deputy sheriff of Jasper County, and they specifically deny plaintiff was in any way damaged.

Plaintiff in reply specifically denies that on the evening of September 6 the defendants were on the real estate in question at the invitation and insistence of Merle Weber, and denies all the allegations in defendants' answer generally and specifically.

At the close of plaintiff's testimony, the defendants having filed a motion to direct a verdict, the court stated that the plaintiff failed to prove there was a conspiracy; that the only proof made was the overt acts of the different parties that night, which was not sufficient. Following the direction of the court the jury returned a verdict for the defendants. From this action of the court plaintiff appeals.

The family home of the parents of the Weber brothers, located on about twenty acres, is about fourteen miles north of Newton in the neighborhood of the town of Laurel. It is situated on the north side of an east-and-west road, and the house occupied by the plaintiff was located about sixty rods south of the road, nearly due south of the family home, in the center of a quarter section rented by plaintiff. The principal error complained of by plaintiff is the action of the court in directing a verdict for the defendants.

Plaintiff was administrator of his mother's estate and as such had obtained a judgment against his brother William Weber. Plaintiff was fifty-nine years of age. At the time of the occurrence of the matters complained of William Weber, brother, age fifty-five, and Merle Weber, an incompetent brother, age fifty-six or fifty-seven, were living in a shack some distance northeast from the old Weber home and the house where Ameil Weber lived. Merle Weber was weak mentally and incompetent. Under his mother's will he was the owner of the land and house first described, known as the "old Weber place." The Weber family had numerous members, brothers and sisters, including Jack

Weber, age fifty-three, who lived in Marshalltown, and Elizabeth Rice, who lived in Des Moines, and who was the guardian of Merle Weber.

At the time of the alleged assault and imprisonment complained of defendant William Weber had been ousted from the twenty acres upon which he had been living, and execution issued on the judgment and property of the said William Weber.

During the year 1945 Ameil Weber made an arrangement with his sister Elizabeth Rice, the guardian of Merle, by which he secured a five-year lease on the old Weber place owned by Merle Weber, and at the same time they executed a five-year contract for the services of Merle Weber and.for his care and a wage of $15 per month.

There is evidence in the record from which the jury might have found the following facts: On September 6, 1945, the old Weber homestead was being cleaned, repapered and repaired under the order of the guardian, in preparation of the occupancy by the plaintiff. On that morning, according to the testimony, Merle, in shaving, had cut himself, a fact that may be significant in discussing the future actions of W. H. Weber, who was living in the shack. The guardian had employed a Mrs. Jones and her daughter Betty to clean and paper the house, and Maxine Olson, housekeeper of the plaintiff's home, was getting dinner for the two women, herself and the plaintiff at the Weber homestead. W. H. (Bill) and J. L. (Jack) Weber came to the house, where dinner was being prepared, and demanded that plaintiff cancel the judgment against said W. H. Weber. This he refused to do. J. L. and W. H. Weber followed plaintiff into the house where, in a bedroom, plaintiff secured a revolver, and the other brothers then left the premises and went to Bill's shack, and Merle Weber accompanied them. Later they drove away from the shack and W. H. Weber drove to Marshalltown on a road which would take him through Laurel. Defendants Seatman, Paul and Muller all were in business and lived at Laurel in Marshall County. J. L. Weber lived in Marshalltown. Snook, a defendant, lived in Jasper County.

Ted Weber, another brother, was at Bill's shack a part of the day on September 6. He testified that the two Weber brothers left the shack in the afternoon and that on their return to the shack, in a conversation between Jack and Bill, it was stated

that they had interviewed people and said: " 'We can't get nobody from over there. We will get somebody else.' [Jack] said he had been to see George Ceaser, Charley Korte and Eddy Damen and Johnny Cline. * * * He said he couldn't get none of them to come over and he would get some other fellows, to gang up on him," and he also said he "wanted to get them over there to the shack to withdraw that judgment. He said he could get some other ones to come on over." Further, "they said they would have to do something—get another mob up." After that Ted said they would have to get someone else and he and Bill left. The arrangement was that they were to meet at Robinson's corner, where the group later did meet. Robinson's corner is about a mile east of the old Weber home.

This witness, Ted, after referring to the occurrences in the shack, stated that he went down to the old homestead and sat there an hour or two until after dark; that he saw a truck turn in at Ameil's outside gate at the road that led to Ameil's home; saw someone there open the gate and drive in; that there were a lot of men in the truck—some standing, some sitting, and some sitting with their feet hanging out the back. This witness testified that he was at the shack from early morning until about five o'clock that afternoon.

Another witness testified to the call of the truck at Ameil's home. One witness, Dorothy Jones, who was working on the papering and repairs, testified to the assault by Bill and Jack about one o'clock in the afternoon, at lunch time, and particularly about the disturbance after the truck arrived, which was about seven or eight o'clock; that there appeared to be two men in the driver's seat; that there was a confusion, loud talking, and someone holding the plaintiff—holding his arms, and that the witness heard three shots in the air; that she could hear blows and heard plaintiff calling for help and there was scuffling; that she heard voices in the crowd state that they would tar and feather and hang him; that she heard persons ordering him to withdraw something—a judgment, and that plaintiff replied: " 'I can't' "; that she heard him ask the persons to "leave him alone"; that someone summoned the sheriff and after the sheriff arrived the crowd went away; that when the sheriff came someone in the crowd said: " 'Forty of us can't be in the wrong of the law' "; that the truck was close and to the left of the porch of

Ameil's house; that some of the men were "right close to Ameil, and it looked like he was being held. * * * It looked like one man in back of him, holding his hands."

Another witness, Ameil's housekeeper, testified as to the arrival of the truck in the evening—a big cattle truck in which were Marvin Enochs and Vernon Seatman, who represented themselves as coming from Dunbar; that they stated they had come to see Ameil about horses; that she called Ameil who came with a flashlight and talked to the two men in the truck; that she went into the house but was called by Ameil to come and help him; that one of the group whom she had seen in the truck had hold of his hands; that there were many men around and someone struck Ameil; this was Jack Weber—hit him several times. Jack took Ameil's gun away from him and shot it off in the air; that another man, a stranger, had his arms around Ameil from the back; that some in the group threatened to hang him; some said they had come to make Ameil withdraw the judgment against Bill; that Marvin Enochs said that they would get a rope and hang him; others said they would tar and feather him; that the men were all swarming out of the truck. There was testimony also as to the extent of the injuries to plaintiff's person.

Plaintiff's testimony as to the disturbance at his house in the evening was much to the same effect. There was testimony that he visited a doctor a day or two following the riot.

The foregoing is a general summary of the testimony, but no claim is made by the plaintiff as to the disturbance at the house at noon. The general claim is of conspiracy culminating in the overt acts in the evening at Ameil's home about seven or eight o'clock. The question is: Was there sufficient evidence to make a foundation for the admission of testimony of coconspirators? The conclusion of the court, in passing upon a motion for a directed verdict, was that a conspiracy was not proved either by facts or by circumstances. With this we do not agree with the court.

I. "A combination of persons to accomplish an unlawful purpose or a lawful purpose unlawfully is a conspiracy." 15 C. J. S., Conspiracy, section 1, page 996. It is, of course, elementary that a conspiracy may be proven by circumstantial evidence. It is frequently incapable of direct proof. Shannon v. Gaar, 233 Iowa 38, 44, 6 N.W. 2d 304, 308, and cases cited;

15 C. J. S., Conspiracy, section 29, page 1043; 11 Am. Jur., Conspiracy, section 56, page 585.

If concert of action having for its purpose the accomplishment of an unlawful act is shown, a sufficient and prima facie case is established. Stambaugh v. Haffa, 217 Iowa 1161, 1163, 253 N.W. 137, 139; State v. Priebe, 198 Iowa 609, 199 N.W. 276; State v. Keul, 233 Iowa 852, 5 N.W. 2d 849.

Defendants plead in their answer that the group of men proceeding as they did merely gathered and visited Ameil Weber with the sole object of remonstrating with the plaintiff on his treatment of his brother Merle; that they were inspired to do it after seeing the cuts and bruises on his body and the bloody condition, and, as a humanitarian and neighborly act, they could prevail upon Ameil Weber to discontinue such treatment. In view of the evidence introduced to show that Merle Weber did not have a black eye on the evening of September 6, 1945, it was for the jury to say whether this claim was substantiated. It would hardly seem that a group of men proceeding as they did, under cover of darkness and with all actions indicating secrecy in their movements, would be gathered for the purpose of carrying out such a humanitarian object as pleaded. Such conduct under such circumstances would be at least very uncommon and contrary to the ordinary experience of men. The jury would be entitled to take into consideration the manner in which the disturbance was conducted. The jury could have found from the testimony that there was a planned and organized attempt to compel Ameil Weber to cancel the judgment; that it was planned that their objective was to be accomplished, if necessary, by violent demonstrations and threats. There undoubtedly was evidence of concert of action which makes a prima facie case of conspiracy. Shannon v. Gaar, and Stambaugh v. Haffa, both supra.

II. An error assigned to the court's ruling is that the court erred when it directed a verdict in favor of such defendants as actually assaulted and struck the plaintiff, and actually and actively held him a prisoner, as they were joint tort-feasors because of their said joint acts and assistance of each other in performing the alleged torts.

It would seem that if the cause had been submitted to the jury and the jury had failed to find a conspiracy, still there

would be a cause of action against those who actively took part and personally assaulted the plaintiff. The finding of the court that as a matter of law there was no conspiracy does not entitle the defendants to a complete exoneration. It has been held at various times that one who is guilty of an overt act and that act is actionable still cannot escape punishment simply because the plaintiff has not established the actual fact of conspiracy; that conspiracy is not an offense in itself, but the overt act is the offense, and the conspiracy incidental. Yocum v. Husted, 185 Iowa 119, 167 N.W. 663; Young v. Gormley, 119 Iowa 546, 93 N.W. 565.

"As a general rule, as the gravamen of the action is the damage and not the conspiracy * * * a verdict or judgment may be rendered against any one or more of defendants, and in favor of the others *. * * if plaintiff fails in the proof of a conspiracy or concerted design, he may still recover damages against one or more of defendants shown to be guilty of the tort without such agreement, and is not entitled to a verdict against defendants whom he does not prove participated in the wrong." 15 C. J. S., Conspiracy, section 31c, page 1052.

See also Jahr v. Steffen, 187 Iowa 168, 174 N.W. 109; Aughey v. Windrem, 137 Iowa 315, 114 N.W. 1047; Jolly v. Doolittle, 169 Iowa 658, 149 N.W. 890; Dickson v. Young, 202 Iowa 378, 210 N.W. 452; Faust v. Parker, 204 Iowa 297, 213 N.W. 794; and Boom v. Boom, Sr., 206 Iowa 70, 220 N.W. 17.

III. Holding, as we do, that a prima facie case of conspiracy had been established, it follows that the acts and statements of the various members of the group engaged in the unlawful act were admissible in evidence. The district court proceeding on the theory that only the individual acts of the persons were admissible and that the testimony as to the acts of the remaining conspirators could not be given necessarily refused to admit much evidence that we think was admissible.

It is unnecessary to go into the details or to set out here the various rulings on evidence which we think were erroneous. In view of our finding and ruling on motion for directed verdict, and the possibility of a retrial, we need not refer to them further. When there is evidence which made out a prima facie case of conspiracy then the acts done and the words spoken which

tend to establish the conspiracy further may be shown even though the coconspirators were not present at the time of such acts and statements. State v. Davis, 230 Iowa 309, 297 N.W. 274. This is a familiar doctrine. 11 Am. Jur., Conspiracy, section 56, page 586.

We are satisfied that a prima facie case was made out and that the court was in error in its holding sustaining the motion for a directed verdict. For the errors pointed out the cause is reversed.—Reversed.

All JUSTICES concur.