**In re Daphne Y. Gibbs CAUBBLE, Debtor.**

**In re Gibbs Farming, an Arkansas General Partnership, Debtor.**

**Nos. 2:11–bk–13085M, 2:11–bk–12679M.**

United States Bankruptcy Court, E.D. Arkansas.

Signed Feb. 20, 2014.

Filed Feb. 21, 2014.

Vincent E. Guest, Attorney at Law, Wynne, AR, J. Brad Moore, Frederick S. Wetzel, III, P.A.,Little Rock, AR, Warren E. Dupwe, Warren E. Dupwe, P.A., Jonesboro, AR, for Warren E. Dupwe, Chapter 7 Panel Trustee.

A. Jan Thomas, Jr., Attorney at Law, West Memphis, AR, for Debtor.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

Daphne Y. Gibbs Caubble (Debtor I) filed a voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code on May 11, 2011, and Warren Dupwe (Bankruptcy Trustee) was appointed Trustee. A related case, Gibbs Farming, An Arkansas General Partnership (Debtor II), filed a voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code on April 25, 2011, and James C. Luker was appointed Trustee. On January 28, 2013, Luker resigned as Trustee and on January 29, 2013, Dupwe was appointed successor Trustee, and is currently Bankruptcy Trustee for both estates.

On May 9, 2013, the Bankruptcy Trustee for Debtor I filed a motion to approve a compromise settlement concerning an alleged dispute between the Bankruptcy Trustee for Debtor I's estate and Tanton H. Gibbs (Tanton), trustee of the Veda F. Gibbs Living Trust dated May 27, 1993, (Veda Trust) and trustee of the Cecil Tanton Gibbs, Jr. Non–Exempt, Qualified Terminable Interest Property Trust dated June 5, 1999, (Non–Exempt QTIP Trust), and Debtor I, personally. The proposed settlement consists of two separate agreements. (Exs. 46 and 47.)

Objections to the proposed settlements were filed by Crop Production Services, Inc. (CPS) and First National Bank of Wynne (First National) on May 17, 2013. First National withdrew its objection on July 22, 2013.

A hearing on the proposed settlement was conducted in Helena, Arkansas, on

July 23, 2013. The Bankruptcy Trustee appeared in person and by counsel, Frederick S. Wetzel, III, and J. Brad Moore. CPS appeared by counsel, Garland J. Garrett of the Rose Law Firm.[1] Tanton, Trustee of the Veda Trust and the Non–Exempt QTIP Trust, appeared by counsel, Charles T. Coleman of the firm, Wright, Lindsey & Jennings. The Bankruptcy Trustee, the objecting creditor, and Tanton filed briefs in the matter. Supplemental arguments were heard on November 6, 2013, in Little Rock, Arkansas at the request of the Court, and the matter was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has jurisdiction to enter a final Order in this case.

## I.

### BACKGROUND

Debtor I and other family members control a bewildering array of agri-businesses,[2] entities, and trusts concerning a 4,000 acre farming operation in Cross County, Arkansas. The D.Y. Gibbs Family Farms Limited Partnership owns 2,000 acres and leases the other 2,000 acres. The cast of characters includes Debtor I, who is the widow[3] of Cecil T. Gibbs, Jr. (C.T.). C.T. predeceased his mother, Veda Gibbs, who is also now deceased. Tanton is Debtor I's son and Veda Gibbs' grandson. (Pl.'s Ex. 1). Jason Rome Helton (Rome Helton) is Debtor I's son and Veda

Gibbs' step-grandson. (Nov. 6 Tr. at 42, Ex. 1.) Helton Farms, Inc., is a corporation owned by Mary Helton, wife of Rome Helton. (Ex. 56.) Phoenix Grain Bins, Inc., is owned by Mary Helton and Tommy Caubble. (Nov. 6 Tr. at 26.) Non-family members of the cast include Olan M. Bailey (Bailey), an attorney in Memphis, Tennessee, who apparently created the trust documents involved in the case, and Edwin H. Jaffe (Jaffe), a financial consultant from Memphis, Tennessee.

## II.

### THE SETTLEMENT

The proposed settlement agreement is as complex, if not more so, than the agri-businesses and trusts Debtor I has wrapped herself in. The first settlement agreement is between the Bankruptcy Trustee of Debtor I and Tanton as Trustee of the Veda Trust and the Non–Exempt QTIP Trust. The second settlement agreement is between the Bankruptcy Trustee of Debtor I and Debtor I, individually.

The following is a summary of the first proposed settlement (Ex. 46):

### A.

1. The Veda Trust will make a cash payment of $151,768.00 to the Bankruptcy Trustee for Debtor I.

2. The Veda Trust will convey a one-half interest in 14 grain bins located in

---

1. After the hearing, Garland J. Garrett passed away before his brief could be filed and John T. Hardin has assumed responsibility for the case on behalf of the Rose Law Firm.

2. The entities and individuals include Debtor II; Gibbs Agro Farms, Inc.; Silva Agro, Inc.; Veda Agro Farms, Inc.; Caubble Farms, Inc.; Gibbs Helton Farms, Inc.; THG Farms, Inc.; Roton Farms, Inc.; Gibbs Farms, Inc.; Gibbs Farm Management, Inc.; Helton Farms, Inc.;

Veda Trust; Veda Residuary Family Trust; C.T. Gibbs, Sr. Credit Shelter Trust; D.Y. Gibbs Family Farms Ltd. Partnership; Gibbs Exempt QTIP Trust; Gibbs Non–Exempt QTIP Trust; Phoenix Leasing Co.; Mary Helton; Tommy Caubble; and Rome Helton. (Ex. 54.).

3. She also was married to Thomas F. Caubble who is now deceased.

Cross County, Arkansas to the Bankruptcy Trustee for Debtor I who agrees to sell his interest back to the Veda Trust for a cash payment of $15,000.00.

3. The Veda Trust will convey the other one-half interest in the same 14 grain bins to Rome Helton upon the condition that Rome Helton sell the one-half interest back to the Veda Trust for the sum of $15,000.00.

4. The Veda Trust will convey to the Bankruptcy Trustee of Debtor I the personal residence of Veda Gibbs and contents currently in the residence, which the Bankruptcy Trustee will sell. The settlement estimates the value of the house at $120,000.00 and the Bankruptcy Trustee testified that he was guaranteed $100,000.00 upon the sale of the house. (Tr. at 40.)

5. The Bankruptcy Trustee of Debtor I will sell at a private sale to the Veda Trust 49% or 147 shares of stock of Gibbs Farm Management for the sum of $30,000.00.

6. The Veda Trust will convey 1,187 shares of the capital stock in First National to the Bankruptcy Trustee of Debtor I. The Bankruptcy Trustee and Tanton agree that the stock is worth $136.00 per share or $161,432.00.

7. Debtor II and Gibbs Farms, Inc., will convey their interest in grain bin number 15 to the Bankruptcy Trustee who will then convey title to bin number 15 to the Veda Trust.

8. The Bankruptcy Trustee of Debtor I will convey to the Non–Exempt QTIP Trust any interest now or ever held by Debtor I or Debtor I's bankruptcy estate in Gibbs Farms, Inc.

9. The Bankruptcy Trustee of Debtor I will convey any additional interest now or ever held by Debtor I or Debtor I's bankruptcy estate in Gibbs Farms Management, Inc., to the Veda Trust.

10. The Bankruptcy Trustee agrees that the settlement is in full and final satisfaction of:

a. All claims the Bankruptcy Trustee or Debtor I have to any income that may have been realized from the grain bins prior to the settlement agreement

b. All claims related to the transfer of capital shares and/or ownership of Gibbs Farm Management, Inc., from Debtor I to Gibbs Farms, Inc.

c. All claims related to the transfer of capital shares and/or ownership of Gibbs Farms, Inc.

d. All claims against the following:

(i) Veda Trust

(ii) Non–Exempt QTIP Trust

(iii) Tanton, Personally

(iv) Tanton as Trustee of the Veda Trust; and

(v) Tanton as Trustee of the Non–Exempt QTIP Trust related to property used, disbursed, consumed or transferred by the two trusts during or before Tanton's service as trustee.

11. The settlement recites that upon Court approval the Bankruptcy Trustee releases the following from all claims, damages, liabilities, obligations, causes of action (except breach of contract):

a. Tanton

b. Veda Trust

c. Non–Exempt QTIP Trust

d. any asset or entities owned by the Veda Trust or the Non–Exempt QTIP trust including but not limited to:

(i) Gibbs Farm Management, Inc.

(ii) Gibbs Farms, Inc.

(iii) Other general or limited partners (not named).

The entities named above will release the Bankruptcy Trustee from all claims except those that might arise from breach of the settlement. The settlement is signed by Dupwe as Bankruptcy Trustee of Debtor I and Tanton as Trustee of the Veda Trust and as Trustee of the Non–Exempt QTIP Trust.

### B.

The settlement agreement between the Bankruptcy Trustee of Debtor I and Debtor I in relevant part is summarized as follows (Ex. 47):

1. Debtor I has agreed to assign her interest in the Veda Trust to the Bankruptcy Trustee of Debtor I, as more fully set forth in the Tanton settlement. (In the Tanton settlement, the Bankruptcy Trustee settles all claims against the Veda Trust.) (Ex. 46, Para. 11.)

2. The consideration paid by the Veda Trust is in full and final satisfaction of all claims Debtor I or the Bankruptcy Trustee may have as the Bankruptcy Trustee of Debtor I, including the following claims:

   a. All claims which the Bankruptcy Trustee and Debtor I may hold with regard to any income that may have been realized from the grain bins prior to this Agreement.

   b. All claims related to the transfer of capital shares and/or ownership of Gibbs Farm Management, Inc. from Debtor I to Gibbs Farms, Inc.

   c. All claims related to the transfer of capital shares and/or ownership of Gibbs Farms, Inc.

   d. All claims against the Veda Trust and the Non–Exempt QTIP Trust or against Tanton, both personally and as Trustee of the Veda Trust and the Non–Exempt QTIP Trust, related to the value of property used, disbursed, consumed, or other-wise transferred by the Veda Trust or the Non–Exempt QTIP Trust, during or before Tanton's service as Trustee.

   e. All claims that the Bankruptcy Trustee may have against Debtor I for any money paid to her husband prior to filing bankruptcy or any interest in a term life insurance policy on her son or any money received prior to the filing of the case from her son for collectible property and any right Debtor I has to receive income and principal distributions from certain trusts established by C.T.

   f. Any and all claims related to the discharge and/or dischargeability of Debtor I.

3. Upon approval of this Agreement by the Bankruptcy Court, the Bankruptcy Trustee releases and discharges Debtor I, and any assets or entities owned by Debtor I from any and all claims, damages, liabilities, obligations and causes of action, except those that may arise due to breach of this Agreement. Likewise, Debtor I releases and discharges the Bankruptcy Trustee from any and all claims, damages, liabilities, obligations and causes of action, except those that may arise due to breach of this Agreement.

4. This Agreement is subject to the approval of the Bankruptcy Court. The agreement is signed by Dupwe as Bankruptcy Trustee of Debtor I and Debtor I, personally. It is not signed by Debtor I's attorney nor is the settlement signed by Dupwe as Bankruptcy Trustee for Debtor II. Neither settlement agreement is signed by other parties involved in the settlement, including Rome Helton, Gibbs Farms, Inc., Tanton, personally, Gibbs Farm Management, Inc., and other unnamed general and/or limited partners.

The Bankruptcy Trustee has not filed any proceeding in either case to recover

any of the properties subject to the settlement. Both bankruptcy cases were filed more than two years before the hearing on the motion for approval of compromise. Counsel for the Bankruptcy Trustee stated that the parties had entered into a tolling agreement. (Tr. at 192–193.) The only previously filed matter subject to the settlement with Debtor I is an objection to Debtor I's discharge (AP No. 2–12–ap–1023) filed February 15, 2012, by the Bankruptcy Trustee. This matter is not currently set for trial on the merits at the request of both Debtor I and the Bankruptcy Trustee. The Bankruptcy Trustee agrees in the settlement to dismiss his claim that Debtor I's discharge should be denied.

Debtor I previously consented to an entry of a judgment determining that the debt owed to CPS in the sum of $891,780.14 for agricultural products sold in 2010 is nondischargeable. (Exs. 35 & 36.) Debtor I also previously consented to a judgment finding the debt to First National in the sum of $2,302,362.99 is nondischargeable. (AP 12–1014; Claims 18–24).

## III.

### C.T. TRUST

C.T. died on June 5, 1999. (Ex. 52.) The estate of C.T. was valued at $4,533,803.00 on the federal estate tax return dated September 25, 2000. (Ex. 52.) C.T. executed a revocable trust instrument dated January 17, 1999, which was amended on June 3, 1999, two days before his death. (Ex. 6.) The trustee was listed as C.T., but upon his death Debtor I, who at the time of C.T.'s death was his wife, became trustee of the trust. The trust directed Debtor I as the trustee to divide the estate into three trusts; the Gibbs Family GST Exempt Trust, the GST Non–Exempt Qualified Terminal Interest Property Trust (Non–Exempt QTIP Trust),

and the GST Exempt Qualified Terminal Interest Property Trust. (Exs. 6 & 52.) The living trust did not allocate which asset was to be placed in which trust. The trust further provided that Debtor I and Tanton would serve as the co-trustees of the Non–Exempt QTIP Trust. (Ex. 6, Para. 10(2).) Debtor I was named the beneficiary of the Non–Exempt QTIP Trust, and is entitled to the net income from the Exempt and Non–Exempt QTIP Trust as well as the right to withdraw up to 5% of the principal of the Non–Exempt QTIP Trust each year. The trust also contained a spendthrift provision as follows:

> The interest of any beneficiary in the income and/or principal of any trust created under this Agreement shall not be subject to alienation, anticipation, assignment, attachment, charge, claims of creditors, encumbrance, sale or transfer and any such interest held by the trustee(s) shall not be liable for the contracts, debts, engagements or obligations of the beneficiary, whether voluntary or involuntary or whether by process of law or equity.

> These paragraphs shall not prohibit an assignment by a beneficiary to any other beneficiary of any trust created under this Agreement.

> If any beneficiary of any trust created under this Agreement shall be committed or institutionalized due to alcoholism or substance abuse, shall be in federal or state bankruptcy or other insolvency proceedings or shall be a party to a divorce, child custody or paternity proceeding or to any legal, judicial, administrative or arbitration proceeding in which a judgment may be entered against the beneficiary or if the property of any beneficiary shall be subject to garnishment, execution, lien, foreclosure proceeding, judgment or otherwise at the time of any mandatory distribution of income or principal of the trust, then

the Trustee shall be authorized to retain the income, principal and/or accumulated income in trust until any such beneficiary is released, discharged or dismissed or until any such garnishment, execution, lien or judgment is satisfied and administer and distribute the principal and/or accumulated income as follows:

1. The trustee(s) may distribute to or for the benefit of such beneficiary all or part of the net income from the beneficiary's separate trust from time to time and in such amounts as the trustee(s) in the trustee(s)' sole discretion shall deem appropriate for the health, education or maintenance of the beneficiary.

2. The Trustee may distribute to or for the benefit of such beneficiary all or part of the principal of that beneficiary's separate trust from time to time and in such amounts as the trustee(s) in the trustee(s)' sole discretion shall deem appropriate for the health, education or maintenance of the beneficiary.

These paragraphs do not apply to me as Grantor and any assets transferred by me to the trustee(s) or successor trustee(s) of this Living Trust.

(Ex. 52.)

The estate tax return of C.T. reflected, among other assets, that the estate of C.T. owned 300 shares of stock in Gibbs Farms, Inc., valued at $404,208.00. (Ex. 52, Schedule B.) The record does not reflect whether the assets were conveyed to the trust in accordance with applicable law. The tax returns of the Non–Exempt QTIP Trust were not made part of the record. The estate tax return reflects an affirmation that the stock in Gibbs Farm, Inc., was placed into the Non–Exempt QTIP Trust. (Ex. 52, Schedule M.) Among the assets allegedly owned by Gibbs Farms, Inc., are twelve acres upon which are located the grain bins that are mentioned in the Veda Trust's specific bequests to Debtor I and Rome Helton. (Tr. at 43, 156; Ex. 13, 27 and 54.) These bins are discussed subsequently.

## IV.

### *THE VEDA TRUST*

Veda Gibbs created a revocable trust on May 27, 1993, which was revised and restated on April 6, 2001, and amended on September 27, 2006, and on March 14, 2008. (Ex. 1 & 3.) During Veda Gibbs' lifetime the trust provided that Veda Gibbs was the trustee and sole beneficiary of the trust. The trust appointed Debtor I as trustee of the trust upon Veda Gibbs' death and appointed Tanton and Rome Helton as successor co-trustees if Debtor I was unwilling to serve as trustee. (Ex. 1.)

Veda Gibbs died on July 15, 2010. (Ex. 4.) Debtor I apparently assumed her duties as trustee of the Veda Trust. (Ex. 9 & 11.) Debtor I resigned as trustee of the Veda Trust on April 25, 2011, and appointed her two sons, Tanton and Rome Helton, as co-trustees. (Ex. 12.) Debtor I filed for bankruptcy protection on May 11, 2011. (Ex. 50.)

The Veda Trust provides in relevant part, "upon my death my successor trustee shall distribute the specific bequests...." (Emphasis added.) There are five specific bequests which are relevant to these proceedings. Three bequests are to Debtor I, one to Karen Gibbs Sylvia and one to Rome Helton as follows:

The sum of Four Hundred Twenty Thousand and 00/100 Dollars ($420,000.00) to my daughter-in-law, DAPHNE Y. (BONNIE) GIBBS [Debtor I] *outright and free of any trust,* if she survives me. This bequest shall not be subject to equitable apportionment for Death Tax purposes. If my daughter-in-law, DAPHNE Y. (BONNIE) GIBBS, does not survive me then this

bequest shall be distributed to my grandchild, TANTON HOLT GIBBS, and to my step-grandchild, JASON C. (ROME) HELTON, in equal shares, if surviving.

My personal residence and the lot upon which it is located, and together with the household goods, furnishings, furniture and other contents of my personal residence, to DAPHNE Y. (BONNIE) GIBBS CAUBBLE, who is the spouse of my deceased child, C.T. GIBBS, JR., *outright and free of any trust,* if she survives me.... This devise and bequest shall not be subject to equitable apportionment for Death Taxes purposes. If DAPHNE Y. (BONNIE) GIBBS CAUBBLE does not survive me, then this devise and bequest shall lapse and the same shall become a part of the residuary of this Living Trust.

The sum of Fifty Thousand and 00/100 Dollars ($50,000.00) to my grandchild, KAREN GIBBS SILVA, if she survives me. This bequest shall not be subject to equitable apportionment for Death Taxes purposes. This bequest is in lieu of any other bequests or gifts to my grandchild, KAREN GIBBS SILVA, in this Living Trust, which are hereinbefore and after deleted and amended accordingly.

The fourteen (14) grain bins located on the property commonly known as 2415 Highway 64 W., Wynne, Cross County, Arkansas, to my daughter-in-law, DAPHNE Y. (BONNIE) GIBBS CAUBBLE, and my step-grandchild, JASON C. (ROME) HELTON, *outright and free of any trust,* in equal shares, or to the survivor of them. (Emphasis added.) This bequest shall not be subject to equitable apportionment for Death Taxes purposes.

(Ex. 1–3.)(Emphasis added.)

The trust provides that it is to be governed by the law of the State of Tennessee. (Ex. 1.) The trust contains the following spendthrift clause:

The interest of any beneficiary in the income and/or principal of *any trust created under this Agreement* shall not be subject to alienation, anticipation, assignment, attachment, charge, claims of creditors, encumbrance, sale or transfer and any such interest held by the trustee(s) shall not be liable for the contracts, debts, engagements or obligations of the beneficiary, whether voluntary or involuntary or whether by process of law or equity.

These paragraphs shall not prohibit an assignment by a beneficiary to any other beneficiary of any trust created under this Agreement.

If any beneficiary of any trust created under this Agreement shall be committed or institutionalized due to alcoholism or substance abuse, shall be in federal or state bankruptcy or other insolvency proceedings or shall be a party to a divorce, child custody or paternity proceeding or to any legal, judicial, administrative or arbitration proceeding in which a judgment may be entered against the beneficiary or if the property of any beneficiary shall be subject to garnishment, execution, lien, foreclosure proceeding, judgment or otherwise at the time of any mandatory distribution of income or principal of the trust, then the Trustee shall be authorized to retain the income, principal and/or accumulated income in trust until any such beneficiary is released, discharged or dismissed or until any such garnishment, execution, lien or judgment is satisfied and administer and distribute the principal and/or accumulated income as follows:

1. The trustee(s) may distribute to or for the benefit of such beneficiary all or part of the net income from the beneficiary's separate trust from time to time and in

such amounts as the trustee(s) in the trustee(s)' sold discretion shall deem appropriate for the health, education or maintenance of the beneficiary.

2. The Trustee may distribute to or for the benefit of such beneficiary all or part of the principal of that beneficiary's separate trust from time to time and in such amounts as the trustee(s) in the trustee(s)' sole discretion shall deem appropriate for the health, education or maintenance of the beneficiary.

These paragraphs do not apply to me as Grantor and any assets transferred by me to the trustee(s) or successor trustee(s) of this Living Trust.

(Ex. 1.) (Emphasis added.)

After payment of administrative expenses, taxes and funeral expenses, the trust states the residuary is to be placed into the Veda Gibbs Family Trust. (Ex. 1.) During the time Debtor I was trustee of the Veda Trust, apparently on the advice of her advisors, she did not make distribution of the specific bequests to herself or to her son, Rome Helton, nor did she put the residuary in a family trust for the benefit of Veda Gibbs' grandchildren. (Ex. 57 at 35–47.) She did make distribution to Karen Gibbs Sylvia of her $50,000.00 specific bequest. (Ex. 11 & 57.) Debtor I did not list any of the property listed in the three specific bequests made to her under the Veda Trust as an asset of her bankruptcy estate as of the date of filing on May 11, 2011.

## V.

### DISCUSSION

The Bankruptcy Trustee testified in support of the settlement. He stated that the settlement resulted from a conference in February 2013 with "all the parties." (Tr. at 37.) He said the estate will receive around $458,000.00 to $478,000.00 from the settlement including cash of $196,000.00 and that $50,000.00 of the settlement will go to Debtor II's bankruptcy estate.[4] (Tr. at 46–47.) The Bankruptcy Trustee reviewed many of the exhibits introduced by the parties in his testimony. He stated he only has $1,600.00 to pay for litigation if the settlement is disapproved and that the litigation would be complicated and expensive. (Tr. at 103–104.)

The Bankruptcy Trustee was unable to explain how he arrived at $15,000.00 as the fair price for the sale of the grain bins to the Veda Trust other than to state that "$30,000.00 is my figure on what I think they will bring at an auction." (Tr. at 138–139.)

The Bankruptcy Trustee stated that the Veda Trust has refused to distribute the specific bequests. (Tr. at 108.) The Bankruptcy Trustee stated that he considered the law applicable to the spendthrift trust provision but that he was not an expert on the subject of spendthrift clauses. (Tr. at 133.) He did not know if anyone had reviewed Tennessee or Arkansas law on spendthrift trusts. (Tr. at 134.)

The Bankruptcy Trustee estimated his trustee fee at between $15,000.000 to $20,000.00 and he estimated the distribution to unsecured creditors of $350,000.00 to $375,000.00 if the settlement is approved. (Tr. at 113–114.) He agreed that the claims in Debtor I's bankruptcy were $3,936,000.00 or "in that neighborhood" resulting in a recovery of eight cents on the

---

4. How this provision will be implemented is unclear since the provision is not contained in either settlement agreement and the Trustee has never signed a settlement on behalf of Debtor II.

dollar if the settlement is approved.[5] (Tr. at 114–115.)

In regard to the releases called for in the settlement, the Bankruptcy Trustee stated he does not know "exactly what is anticipated by all the parties that have been involved in this." (Tr. 157–158.) The Bankruptcy Trustee stated that he was not trying to bar any creditor from collecting on their claim and he does not think the settlement will impede a creditor's efforts to go after assets that are to be conveyed to the Veda Trust. (Tr. at 201.) He has not asked CPS or anyone if they wanted to buy the claims the Bankruptcy Trustee has against any of the trusts in question. (Tr. at 169.)

## VI.

*SETTLEMENT BETWEEN THE BANKRUPTCY TRUSTEE AND TANTON AS TRUSTEE FOR THE VEDA TRUST AND THE NON–EXEMPT QTIP TRUST*

### A.

**THE VEDA TRUST WILL MAKE A CASH PAYMENT OF $151,768.00 AND CONVEY VEDA GIBBS' PERSONAL RESIDENCE AND CURRENT CONTENTS TO THE BANKRUPTCY TRUSTEE.**

CPS argues that the specific devises to Debtor I are not protected by the spend-

thrift provision and therefore the devises are part of the bankruptcy estate. Accordingly, CPS argues that the $151,769.00 payment is inadequate because Debtor I, on the date the petition was filed, was already entitled to a cash payment of $420,000.00 and the transfer of Veda Gibbs' personal residence in Cross County, Arkansas, plus household goods, furniture, fixtures, and other contents.[6] Tanton argues that the devises to Debtor I are protected by the spendthrift provision and therefore do not come into the bankruptcy estate.

■ A valid spendthrift provision under state law is enforceable in a bankruptcy proceeding, and property subject to a spendthrift provision does not become property of the bankruptcy estate. 11 U.S.C. §§ 541(a)(1) & 541(c)(2). As stated in 5 Collier on Bankruptcy ¶ 541.27 (Alan N. Resnick & Henry J. Sommer et al. eds., 16th ed.):

> Spendthrift trusts are a particular type of expense trust. They require specific focus because code section 541(a)(2) excludes the interest of the debtor-beneficiary in spendthrift trusts from property of the estate....

> A spendthrift trust is "a trust that restrains voluntary or involuntary alienation of all or any of the beneficiaries' interests."

---

**5.** There is nothing in the record to substantiate this estimate. Bankruptcy Trustee testified that any such calculation would be "the last procedure." (Tr. at 114.) Debtor I's schedules reflect secured claims of $5,267,096.29, unsecured claims of $2,673,931.96, and assets of $88,792.02. Debtor II's schedules reflect secured claims of $5,267,096.29, unsecured claims of $2,645,774.38, and assets of $3,582,482.58. However, many of the claims in Debtor I's case are based on guarantees in Debtor II's case. Until the claims have been analyzed and corrected for duplication and reduced by

the results of the liquidation of collateral held by many of the secured creditors, it is impossible to know what payments to unsecured creditors will be.

**6.** The residence was appraised at $130,000.00. There was evidence that Debtor I removed some or all of the personal property in the residence and its value is unknown. (Ex. 57 at 36, Jaffe 2004 Exam.) The Bankruptcy Trustee testified that he did not know the value of the personal property taken from Veda Gibbs' home. (Tr. at 135.).

■ The spendthrift provision only applies to trusts set up to hold the residuary estate. *See* Ark.Code Ann. § 28–73–506 (whether or not a trust contains a spendthrift provision a creditor . . . may reach a mandatory distribution of principal . . . if the trustee has not made the distribution to the beneficiary within a reasonable time after the designated distribution date).

■ The Veda Trust specifically states that "[t]he interest of any beneficiary in the income and/or principal of *any trust created under this Agreement* shall not be subject to alienation, anticipation . . ." etc. (Ex. 1)(Emphasis added.) It also states that the trustee, upon Veda Gibbs' death, *shall make* specific bequests to Debtor I and then the residuary estate was to be held in the Veda F. Gibbs Family Trust for the benefit of Veda Gibbs' grandchildren, Karen Gibbs Silva and Tanton, and her step-grandchild, Rome Helton. (Ex. 1)(Emphasis added.) The Veda Trust in plain language stated that the devises to Debtor I were to be made "outright and free of any trust." Debtor I is not a beneficiary of the family trust and according to Jaffe, Debtor I's financial advisor, the family trust had not even been set up as of the date of his deposition on December 15, 2011. (Ex. 57 at 33, Jaffe 2004 Exam.)

The testator's intent is unambiguous. The duty of the trustee in the Veda Trust upon Veda Gibbs' death is to make distribution of the specific bequests to Debtor I and not hold them in trust. The spendthrift provision, therefore, does not apply to the specific bequests and does not prevent them from coming into the bankruptcy estate. Tanton argues that the spendthrift protection continues so long at the assets remain property of the Veda Trust. However, it is clear from the language of the trust document that upon Veda Gibbs' death, the bequests were no longer part of the trust and were to be distributed.

## B.

## THE VEDA TRUST WILL CONVEY A ONE–HALF INTEREST IN THE 14 GRAIN BINS TO THE BANKRUPTCY TRUSTEE AND TO ROME HELTON, WHO WILL THEN SELL THEIR INTERESTS BACK TO THE VEDA TRUST FOR THE SUM OF $15,000.00 EACH

Several objections to this provision are raised. The fact that the estate is already entitled to this distribution has been discussed in the preceding section.

Also, there is no support in the record for determining one-half the value of the 14 grain bins at $15,000.00. On March 26, 2012, the grain bins were appraised at $112,000.00, not including Grain Bin 15 or the land upon which the bins were constructed. (Ex. 45.) The Bankruptcy Trustee estimated that if he had to sell the half interest in the grain bins, he would only receive junk value of $15,000.00, but he offered no specific basis for this estimate. (Tr. at 42.)

CPS not only argues that $15,000.00 is too low a price for the estate's one-half interest in the grain bins, but that the sale back to the Veda Trust is an attempt to "wash" the assets through the bankruptcy proceeding, which might hinder CPS's efforts to collect on its nondischarged debt of $891,714.14 once the bankruptcy case is concluded. (CPS Brief at 11.) CPS also argues that this aspect of the settlement will require the Bankruptcy Trustee to sell the estate's interest in the grain bins back to the Veda Trust without satisfying the requirements of notice and a hearing prior

to sale, pursuant to 11 U.S.C. § 363. (CPS Brief at 19.)

## C.

### THE VEDA TRUST WILL PURCHASE FROM THE BANKRUPTCY TRUSTEE 147 SHARES (49%) OF GIBBS FARM MANAGEMENT INC. FOR $30,000.00

Debtor I originally paid $61,875.00 for Gibbs Farms Management, Inc. in 2001. (Ex. 57 at 100, Jaffe 2004 Exam.) On March 4, 2011, Debtor I transferred 51% of the stock in Gibbs Farm Management, Inc. to Gibbs Farms, Inc. for $31,556.25. (Ex. 31, Paragraph 5). In her May 11, 2011 bankruptcy petition, Debtor I scheduled a 49% ownership in Gibbs Farm Management, Inc. as an asset and valued her interest at $15,000.00. (Ex. 50, Bankruptcy Petition, Schedule B.) The conveyance of the stock to Gibbs Farms, Inc. was not disclosed as required by Question 10 of the Statement of Financial Affairs of Debtor I's bankruptcy petition. (Ex. 50; Ex. 55 at 121, Day 1, Debtor I 2004 Exam.) The price of $31,556.25 was based on the amount Debtor I paid for the stock when it was first purchased. (Ex. 55 at 14, Day 2, Debtor I 2004 Exam.) Debtor I stated, "The 49% would be ... a minority shareholder's amount. So it was devalued to the $15,000.00." (Ex. 55 at 15, Day 2, Debtor I 2004 Exam.)

After Debtor I sold the 51% on March 4, 2011, she deposited the sale proceeds in her personal account and on March 11, 2011, transferred $10,000.00 to her husband. (Ex. 55 at 14, Day 2, Debtor I 2004 Exam.) According to Jaffe, Gibbs Farms, Inc. bought the stock in Gibbs Farms Management with loan proceeds from the "QTIP Trust," which eventually became the owner of the stock. (Ex. 57 at 102–104, Jaffe 2004 Exam.) Jaffe said he was not aware of any documentation for the loan. (Ex. 57 at 104, Jaffe 2004 Exam.)

The Bankruptcy Trustee is conveying in the settlement agreement not only 49% of the stock in Gibbs Farm Management, Inc. but is also giving up a potential cause of action for a fraudulent conveyance under both bankruptcy law and state law. Gibbs Farms Management, Inc. owns a 2% interest in D.Y. Gibbs Family Farms Limited Partnership. (Ex. 5 at 2.) The limited partnership owns unencumbered land valued at between $4,475,000.00 and $7,135,000.00, so Gibbs Farm Management's 2% share of the share of the farm's liquidation value is between $89,500.00 and $142,700.00. (Exs. 28, 44).

Additionally, Gibbs Farms Management, Inc. is the sole general partner of the D.Y. Gibbs Family Farms Limited Partnership and, therefore, has 100% control of the activities of the limited partnership. (Ex. 5, Art. 4 at 1, 7–11.) In fact, the other limited partners have no authority to manage, conduct or control the business of the partnership. (Ex. 5, Art. 4.2.1.) *See also* Ark.Code Ann. § 4–47–406(a) (Michie 2011) (with limited exceptions, the general partner may exclusively decide any matter relating to the partnership activities). If the Bankruptcy Trustee recovered the transfer of 51% of Gibbs Farms Management, Inc. stock as a fraudulent conveyance and combined it with the 49% interest which is currently property of Debtor I's estate, he would control the entity that conducts most of the farming business of Debtor I and her family and related entities. This result would likely produce a very valuable asset for the Bankruptcy Trustee to sell at public auction.

## D.

### THE VEDA TRUST WILL TRANSFER 1,187 SHARES OF STOCK IN FIRST NATIONAL TO THE BANKRUPTCY TRUSTEE. HE WILL SELL THE STOCK PURSUANT TO 11 U.S.C. § 363. THE SETTLEMENT STIPULATES THAT THE VALUE OF THE STOCK IS $136.00 PER SHARE OR A TOTAL OF $161,432.00.

The tax return for the estate of C.T. schedules the value of the stock in First National at $65.00 a share in June 1999. (Ex. 52 at 9.) There is no other reliable evidence in the record to indicate the value of the stock.

Debtor I was instructed by Jaffe on March 4, 2011, to purchase the stock as Trustee of the Veda Trust from the Non–Exempt QTIP Trust for $166,726.57. Debtor I was also instructed by a letter from Jaffe to deposit the funds received from the Veda Trust to the checking account of the Non–Exempt QTIP Trust. (Ex. 15.) The letter recites that $130.42 per share was the declared book value in the 2010 annual report. (Ex. 15.) At that time, Debtor I was Trustee of the Veda Trust, and she and her son were Co-trustees of the Non–Exempt QTIP Trust. (Ex. 15.)

Since the estimate of the value of the bank's stock was based on the bank's 2010 annual report, the value would have been fixed before the bank incurred any loss as a result of the bankruptcy filings of Debtors I and II in 2011. The book value of the bank stock in 2010 is not relevant to the market value of the bank stock in 2013. The value of the stock will vary with the bank's profitability and performance each year and is subject to change. There is no basis in the record to establish the present value of the stock at $136.00 per share. Attempts to do so are based on a less than arm's length sale between two entities controlled by Debtor I and her son at the specific instruction of Debtor I's advisors. A sale under these circumstances is of little value in determining the market value of the bank's stock in 2013.

The Bankruptcy Trustee testified that if he put the bank president on notice that he would sell the stock at public auction, that would "light a fire under him and his shareholders and his board and I'll get an offer on that." (Tr. at 114.) The Bankruptcy Trustee did not know why he was being given the bank stock by the Veda Trust instead of the Veda Trust liquidating the stock and paying him the proceeds. Nor did he did explain why he was bearing the risk that the stock would bring less than $136.00 a share. (Tr. at 148–49.)

## E.

### DEBTOR II AND GIBBS FARMS, INC. WILL CONVEY THEIR INTEREST IN BIN 15 TO THE BANKRUPTCY TRUSTEE WHO WILL THEN CONVEY BIN 15 TO THE VEDA TRUST

Grain Bin 15 is located adjacent to the 14 grain bins previously discussed. Apparently part of a unified storage operation, Bin 15 and the other bins are constructed upon 12.41 acres of real property. (Ex. 27.) The Bankruptcy Trustee testified that Gibbs Farms, Inc. owns the real property beneath the grain bins. (Tr. at 142.) The 14 bins, constructed in 2000, each have a storage capacity of 32,000 bushels, and Bin 15, constructed in 2007, has a storage capacity of 102,000 bushels. (Ex. 27.)

On March 11, 2011, Debtor I, individually and as partner of the separate Debtor II, conveyed to the grantee, Gibbs Farm, Inc., by bill of sale, "[t]he 60′ grain bin

commonly known as the 'Big Bin' located on the 12.41 acres, NW 1/4 of NW 1/4 Sec 7 T7N R3E, Wynne, AR owned by Gibbs Farms, Inc." (Ex. 10). The bill of sale also shows the conveyance was accepted on behalf of the grantee by Debtor I as president of Gibbs Farms, Inc. Nominal consideration of $10.00 was recited as being paid to Debtor II for the property transferred.

In addition, as part of the transaction, a note to First National owed by Gibbs Farms, Inc. was paid off with $104,238.63 in funds transferred from the Non–Exempt QTIP Trust to Gibbs Farms, Inc., which was allegedly owned by the same Non–Exempt QTIP Trust. (Exhibit 31 at Item # 6). Gibbs Farms Inc. gave the Non–Exempt QTIP Trust a demand note for $105,000.00 at 2% per annum on March 10, 2011. (Ex. 53.)

Neither Debtor I nor II reported the March 11, 2011 transfer of Bin 15 as required by Question 10 of the Statement of Financial Affairs in their bankruptcy petitions filed on May 11, 2011 and April 25, 2011. (Ex. 50 at 39, Debtor I's bankruptcy petition; Debtor II's bankruptcy petition, Case No. 2:11–bk–12679, docket entry # 1 at 39.)

Although the 12 acres of real estate upon which all of the grain bins are located are purportedly owned by Gibbs Farms, Inc., there is no evidence in the record of any attempt to examine the deed records to verify this assertion. (Tr. at 17, November 6, 2013 hearing.)

The Bankruptcy Trustee gives up this valuable fraudulent conveyance action without receiving anything specific in exchange. Also, the record does not explain why the bankruptcy estate is being used as a sort of clearing house, except for the purpose of "washing" the asset through the bankruptcy case and perhaps diminishing the taint of fraud attached to the transfer of Bin 15 by Debtors I and II for no or nominal consideration on the eve of bankruptcy.

F.

## THE BANKRUPTCY TRUSTEE SHALL CONVEY TO THE NON–EXEMPT QTIP TRUST ANY INTEREST NOW OR EVER HELD BY DEBTOR I OR THE BANKRUPTCY ESTATE IN GIBBS FARMS, INC.

Gibbs Farms, Inc., was part of the estate of C.T., and all of the outstanding stock (300 shares) was valued at $404,208.00. (Ex. 52, Form 706 at 9.) According to Jaffe, this stock was supposed to have been placed in the Non–Exempt QTIP Trust. (Ex. 7; Ex. 57 at 80, Jaffe 2004 Exam.) Debtor I and her son Tanton are co-trustees. (Ex. 55 at 52, Day 1, Debtor I's 2004 Exam).

However, nowhere in the record is there evidence of stock being transferred to the Non–Exempt QTIP Trust in accordance with state law. It was discovered by Jaffe and others that Debtor I had been listed on tax returns as the owner of 100% of the stock of Gibbs Farms, Inc. in 2003 and in 2005 through 2009. (Ex. 57 at 81, Jaffe 2004 Exam.) (Ex. 55, Day 2 at 38, Debtor I 2004 Exam.) The relevant corporate tax returns were signed by Debtor I and submitted to the IRS. (Ex. 55 at 38, Day 2, Debtor I 2004 Exam.) Furthermore, Debtor I listed on a financial statement dated December 31, 2009, the ownership of the stock in Gibbs Farms, Inc. valued at $318,512.00. (Ex. 55, Day 1 at 108–109, Debtor I 2004 Exam.) There was evidence that Debtor I inquired about purchasing the shares from the Non–Exempt Q–Tip Trust but decided not to do so. (Ex. 7.) The record is silent as to why Debtor I listed the stock as an asset on the tax returns and on financial statements.

The tax return for 2010 now reflects that the Non–Exempt QTIP Trust is the owner of 100% of the stock in Gibbs Farms, Inc. (Ex. 7; Ex. 57 at 81, Jaffe 2004 Exam.) The Bankruptcy Trustee testified that he has not seen a stock book or stock certificates for Gibbs Farms, Inc. (Tr. at 144.) The corporation's stock book and records are missing. (Ex. 57 at 194, Jaffe 2004 Exam.) A corporation is required to keep these records pursuant to state law. *See, e.g.,* Ark.Code Ann. §§ 4–26–715, 4–27–140 (Michie 2011) (each corporation shall keep a record of its shareholders; a shareholder is a person in whose name the shares are registered in the corporate records).

Debtor I stated she has no record of a conveyance of the stock in Gibbs Farms, Inc., to the Non–Exempt QTIP Trust. (Ex. 55, Day 1, Debtor I 2004 Exam at 39.) If the conveyance of the stock to the Non–Exempt QTIP Trust in 2010 could be set aside as a sham or fraudulent transfer, the Bankruptcy Trustee of Debtor I's estate would be the owner of a one-half interest in 14 grain bins, by virtue of the Veda Trust bequest to Debtor I, and owner of the stock of Gibbs Farms, Inc., which owns Bin 15 and the ground beneath the entire grain bin operation. Thus, the Bankruptcy Trustee would own assets worth approximately $1.7 million, less the value of Rome Helton's one-half interest in the 14 bins. (Tr. at 212–14; Ex. 27). Partition of the property would probably not be necessary, and the Bankruptcy Trustee could sell the entire operation with Rome Helton's interest attaching to the proceeds, pursuant to Sections 363(f) and (h) of the Bankruptcy Code.

CPS argues that this provision of the settlement is without consideration because the Non–Exempt QTIP Trust is not giving the bankruptcy estate anything in return for the conveyance of any interest claimed in Gibbs Farms, Inc. Since the Veda and Non-exempt QTIP Trusts take the position that Debtor I never owned the Gibbs Farms Inc. stock, and, therefore, the Bankruptcy Trustee does not now own the stock, the only thing the Bankruptcy Trustee has to convey is a cause of action to recover the stock from the current owner, whoever that is.

The record leaves out many facts relevant to this issue. The fact that the Gibbs Farm Inc. stock records are missing is not a factor favorable to Debtor I. Even if these records remain missing, Debtor I's and Gibbs Farms, Inc.'s tax returns are obtainable and should show who received the income or loss during the years Debtor I was claiming to own 100% of the stock. The record reflects that Erwin & Company has the missing 2004 tax return for Gibbs Farms, Inc., which would show who claimed to own the corporation and who received benefit from it, yet it is not in the record. (Ex. 7). It appears that neither the Bankruptcy Trustee nor anyone else has asked the accountant for the documents or inquired about why the returns for 2003 and 2005 through 2009 reflected Debtor I as the owner of Gibbs Farms, Inc.

There is evidence that one of Debtor I's attorneys has the corporate records of Gibbs Farms, Inc., but no evidence the Bankruptcy Trustee or anyone else has asked for the records or deposed the attorney. (Ex. 31). Also, the tax returns of the Non–Exempt QTIP Trust should reflect whether it was claiming ownership of the stock in 2002 to 2009 and/or reporting income or loss from the operation of the corporation. All of these issues should have been investigated before agreeing to the settlement of this important issue.

## G.

### THE BANKRUPTCY TRUSTEE SHALL CONVEY ANY ADDITIONAL INTEREST NOW OR EVER HELD BY DEBTOR I OR THE BANKRUPTCY ESTATE IN GIBBS FARM MANAGEMENT, INC. TO THE VEDA TRUST

This provision of the settlement appears to be a duplication of the terms of the settlement described above in Section VI 'C' and, therefore, is redundant. Further, the provision is nonsensical because it proposes in part that the Bankruptcy Trustee convey Debtor I's interest now or ever held in Gibbs Farm Management, Inc. The Bankruptcy Trustee would only possess property of Debtor I's estate and not property belonging to Debtor I that is not property of the estate. *See, generally*, 11 U.S.C. §§ 541(b) & 522 (2012). The Bankruptcy Trustee is without authority to convey Debtor I's separate property, if she has any.

## H.

### THIS AGREEMENT FULLY AND COMPLETELY SATISFIES ANY AND ALL OBLIGATIONS THE VEDA TRUST MAY HAVE TO DEBTOR I AND THE BANKRUPTCY TRUSTEE UNDER THE TERMS OF THE VEDA TRUST

█ This provision purports to settle all obligations of the Veda Trust to Debtor I, which is beyond the power of the Bankruptcy Trustee, who only has authority over causes of action of the bankruptcy estate of Debtor I as distinguished from Debtor I individually. Debtor I is not a party to this settlement agreement; therefore, this provision accomplishes nothing. (See Ex. 46, stating settlement is between the Bankruptcy Trustee and Tanton as trustee of the Veda Trust and the Non–Exempt QTIP Trust.)

## I.

### THE CONSIDERATION PAID BY THE VEDA TRUST IS FULL AND FINAL SATISFACTION OF ALL CLAIMS DEBTOR I OR THE BANKRUPTCY TRUSTEE MAY HAVE AS TRUSTEE FOR THE CHAPTER 7 BANKRUPTCY ESTATE OF DEBTOR I, INCLUDING THE FOLLOWING CLAIMS:

A. ALL CLAIMS WHICH THE BANKRUPTCY TRUSTEE AND DEBTOR I MAY HOLD WITH REGARD TO ANY INCOME THAT MAY HAVE BEEN REALIZED FROM THE GRAIN BINS PRIOR TO THIS AGREEMENT.

B. ALL CLAIMS RELATED TO THE TRANSFER OF CAPITAL SHARES AND/OR OWNERSHIP OF GIBBS FARM MANAGEMENT, INC. FROM DEBTOR I TO GIBBS FARMS, INC.

C. ALL CLAIMS RELATED TO THE TRANSFER OF CAPITAL SHARES AND/OR OWNERSHIP OF GIBBS FARMS, INC.

D. ALL CLAIMS AGAINST THE VEDA TRUST AND THE NON-EXEMPT QTIP TRUST OR AGAINST TANTON, BOTH PERSONALLY AND AS TRUSTEE OF THE VEDA TRUST AND THE NON–EXEMPT QTIP TRUST, RELATED TO THE VALUE OF PROPERTY USED, DISBURSED, CONSUMED, OR OTHERWISE TRANSFERRED BY THE VEDA TRUST OR THE NON–EXEMPT QTIP TRUST, DURING OR BEFORE TANTON'S SERVICE AS TRUSTEE.

J.

UPON APPROVAL OF THIS AGREE-
MENT BY THE BANKRUPTCY
COURT, BANKRUPTCY TRUSTEE
RELEASES AND DISCHARGES
TANTON, THE VEDA TRUST,
THE NON–EXEMPT QTIP TRUST,
AND ANY ASSETS OR ENTITIES
OWNED BY THE VEDA TRUST
OR THE NON–EXEMPT QTIP
TRUST (INCLUDING, BUT NOT
LIMITED TO GIBBS FARM MAN-
AGEMENT, INC., GIBBS FARMS,
INC., THE LIMITED PARTNER-
SHIP AND ANY OTHER GENER-
AL OR LIMITED PARTNERS OF
THE LIMITED PARTNERSHIP
AND THE ASSETS OF THE GEN-
ERAL OR LIMITED PARTNERS
OF THE LIMITED PARTNER-
SHIP) FROM ANY AND ALL
CLAIMS, DAMAGES, LIABILI-
TIES, OBLIGATIONS AND
CAUSES OF ACTION, EXCEPT
THOSE THAT MAY ARISE DUE
TO BREACH OF THIS AGREE-
MENT. LIKEWISE, TANTON,
THE VEDA TRUST, THE NON–
EXEMPT QTIP TRUST, AND EN-
TITIES OWNED BY THE VEDA
TRUST OR THE NON–EXEMPT
QTIP TRUST RELEASE AND DIS-
CHARGE THE BANKRUPTCY
TRUSTEE FROM ANY AND ALL
CLAIMS, DAMAGES, LIABILI-
TIES, OBLIGATIONS AND
CAUSES OF ACTION, EXCEPT
THOSE THAT MAY ARISE DUE
TO BREACH OF THIS AGREE-
MENT.

CPS argues that these releases are too broad and in some cases are made for no consideration. For instance, the Non–Exempt QTIP Trust makes no payment to the Bankruptcy Trustee. Tanton, individually, makes no payment to the Bankruptcy Trustee nor did he sign the settlement agreement as an individual. Obviously, entities not specifically identified, including unknown, unnamed general or limited partners, cannot reasonably be released by the Bankruptcy Trustee. Nor can Gibbs Farm Management, Inc. or Gibbs Farms, Inc. be subject to the release because they did not sign the settlement nor did either entity contribute any property toward the settlement award to the Bankruptcy Trustee.

VII.

THE SETTLEMENT BETWEEN
DEBTOR I AND THE BANK-
RUPTCY TRUSTEE

Exhibit 47

A.

The only operative provision of this agreement is in paragraph number three, "Debtor has agreed to assign her interest in the Veda Trust to the Trustee, as more fully set out in the Tanton Settlement." (Ex. 47 at 2.) This cryptic provision appears to convey Debtor I's rights to the specific bequests under the Veda Living Trust through her bankruptcy estate back to the Veda Trust and Non–Exempt QTIP Trust. This and other provisions regarding transfers of property to the Bankruptcy Trustee and then to the Veda Trust appear to be designed to bring the assets within the protection of the spendthrift provision even though they were originally excluded as specific bequests.

B.

For the most part, the releases in paragraph four duplicate the releases contained in the settlement with the Veda and Non–Exempt QTIP Trusts. (Compare Ex. 46 at 4, ¶ 12 with Ex. 47 at 3, ¶ 4.) Among the additional claims released by this settlement are claims to recover sham transfers

from the Veda Trust to the Debtor I that are disguised as legitimate transactions. Even though the Trustee of the Veda Trust has ostensibly declined to make the specific distributions to Debtor I based on his interpretation of the spendthrift provision, Debtor I has received disguised distributions as follows:

1. $25,000.00 in February 2011 described as a trustee fee. (Tr. 23, Ex. 57 at 23.) The Debtor I had only served as trustee of the Veda Trust since August 16, 2010, some five and one half months. (Ex. 57 at 40–41.)

2. $100,000.00 paid in November 2011 from the Veda Trust to Helton Farms, Inc. (Exhibit 40). Attorney Bailey suggested describing the transfer as a loan in place of a distribution to Debtor I, implying that Debtor I has some control over Helton Farms, Inc. (Ex. 22.)

3. $45,000.00 paid in July 2012 from Veda Trust to Helton Farms, Inc. (Ex. 39.)

Additionally, the Bankruptcy Trustee agrees under the settlement not to object to Debtor I's discharge, which probably will require his dismissal of the pending objection to her discharge after notice and a hearing.[7] The Bankruptcy Trustee also surrenders numerous causes of action such as alter ego claims against the various farm entities and trusts as sham organizations. *See, e.g., In re B.J. McAdams, Inc.,* 66 F.3d 931, 936–37 (8th Cir.1995) (concluding corporate creditor was mere alter ego of corporate debtor; thus, creditor's corporate form had to be disregarded); *In re Richmond,* 430 B.R. 846, 861 (Bankr. E.D.Ark.2010) (finding entities were shells

used by debtor to defraud; thus, corporate form may be rejected under alter ego theory) (citing *McAdams,* 66 F.3d at 937); *Humphries v. Bray,* 271 Ark. 962, 967, 611 S.W.2d 791, 793 (Ark.App.1981) (holding corporation was alter ego of single shareholder).

Furthermore, the Bankruptcy Trustee surrenders causes of action against Debtor I, Rome Helton, Veda Trust, Non–Exempt QTIP Trust, Jaffe, Bailey, Tanton, and others for civil conspiracy to defraud creditors. *See, e.g., Williams v. Hency,* 254 Ark. 685, 687, 495 S.W.2d 875, 877 (1973) (stating prima facie case for civil conspiracy is established by a concerted action to accomplish an unlawful act) (citing *Weber v. Paul,* 241 Iowa 121, 40 N.W.2d 8 (1949)); *Mason v. Funderburk,* 247 Ark. 521, 529, 446 S.W.2d 543, 547 (1969) (recognizing that conspiracy can be inferred if shown that conspirators pursued same unlawful object so that their acts are connected) (citing *Wilson v. Davis,* 138 Ark. 111, 211 S.W. 152 (1919); *Stewart v. Hedrick,* 205 Ark. 1063, 172 S.W.2d 416 (1943)).

## VIII.

### APPLICABLE LAW

Federal Rule of Bankruptcy Procedure 9019(a) provides that "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. . . ."

The Eighth Circuit Bankruptcy Appellate Panel has observed that the standard for approving a compromise is " 'whether the settlement is fair and equitable and in the best interests of the estate . . . the purpose of a compromise is to

---

7. The record presented in these proceedings reveals a strong case for denial of Debtor I's discharge and also evidences that she has committed violations of the bankruptcy laws that are criminal in nature. *See, e.g.,* 18 U.S.C. 152(2) (2012) (false oaths); 18 U.S.C. 157 (2012) (scheme to defraud).

allow the trustee and creditor[s] to avoid the expenses and burdens associated with litigating sharply contested and dubious claims'" *Martin v. Cox (In re Martin),* 212 B.R. 316, 319 (8th Cir. BAP 1997) (quoting *In re Apex Oil Company,* 92 B.R. 847, 866–67 (Bankr.E.D.Mo.1988) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) & *United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.),* 669 F.2d 1325, 1328 (9th Cir.1982))).

The settlement need not constitute the best results available and the court "need only canvass the issues to determine that the settlement does not fall 'below the lowest point in the range of reasonableness.'" *Id.* (quoting *Apex Oil,* 92 B.R. at 867 (quoting *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.1983))). In assessing reasonableness, the Court does not substitute its judgment for that of the trustee. *Id.* (citing *In re Bates,* 211 B.R. 338, 343–44 (Bankr.D.Minn.1997)).

The burden of proof is on the Bankruptcy Trustee by a preponderance of the evidence as the party seeking approval of a settlement. *Martin v. Kane (In re A & C Properties),* 784 F.2d 1377, 1382 (9th Cir.1986) (citing *In re Hallet,* 33 B.R. 564, 565–66 (Bankr.D.Me.1983)); *Velde v. First Internat'l Bank & Trust (In re Y–Knot Constr. Inc.),* 369 B.R. 405, 408 (8th Cir. BAP 2007) (citing *TCF Banking & Sav. v. Leonard (In re Erickson),* 82 B.R. 97, 99 (D.Minn.1987)); *In re Boyer,* 354 B.R. 14 (Bankr.D.Conn.2006) (citing *In re A & C Properties,* 784 F.2d at 1381) *aff'd,* 372 B.R. 102 (D.Conn.2007) *aff'd,* 328 Fed. Appx. 711 (2d Cir.2009).

In determining the fairness, reasonableness, and adequacy of a proposed settlement, the Court must consider the following criteria:

1. The probability of success in the litigation;

2. The difficulty, if any, to be encountered in the matter of collection;

3. The complexity of the litigation involved and the expense, inconvenience, and delay attending it;

4. The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Drexel, Burnham, Lambert, Inc. v. Flight Transp. Corp., FTC (In re Flight Transp. Corp. Sec. Litig.),* 730 F.2d 1128, 1135 (8th Cir.1984) (citing *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929)); *In re Trism, Inc.,* 286 B.R. 744, 748 (Bankr. W.D.Mo.2002) (citing *In re Flight Transp. Corp. Sec. Litig.,* 730 F.2d at 1135); 10 Collier on Bankruptcy ¶ 9019.02 (Alan N. Resnick & Henry J. Sommer, *et al.* eds., 16th ed.).

Determining the probability of success is a complex endeavor because the settlement involves so many different issues. The probability of success to compel the Veda Trust's specific bequests to Debtor I seems highly likely, simply because of the express wording of the trust instrument. The drafter of the Veda Trust and the C.T. Trust, which created the Non-Exempt QTIP Trust, used identical language for each spendthrift provision. (Ex. 1 at 37; Ex. 6 at 34.) The C.T. Trust did not contain any specific bequests; rather, all of the assets went into one of three trusts that it created, each of which was referred to in the spendthrift clause as "trust created under this instrument." (Ex. 6 at 34.) However, the Veda Trust did make specific bequests to Debtor I that were to be distributed "outright and free of trust."

Thus, by its terms, the Veda Trust excludes the mandatory bequests from the scope of the spendthrift provision, which applies only to the interests of the beneficiaries in the income and principal held in any trust created under the Veda Trust. (Ex. 1 at 37.) The obvious intention of the testator was that the spendthrift provisions were to apply to the trusts for Veda Gibbs' grandchildren set up by the Veda Trust upon her death. Otherwise, she would have used a spendthrift provision different from the C.T. Trust, which made no specific bequest.[8]

Furthermore, actions to recover the transfers of Gibbs Farms, Inc. stock and Grain Bin 15 and the objection to Debtor I's discharge also appear likely to succeed, although these matters are more difficult to judge because of the lack of some relevant information. Whether the Bankruptcy Trustee can undo the transfer of 51% of the stock in Gibbs Farm Management is a more complex question because consideration for the stock changed hands. Therefore, the Bankruptcy Trustee would probably have to prove either actual fraud or constructive fraud based on evidence that the consideration was less than the reasonably equivalent value of the stock.

The Court does not foresee great difficulty in collecting any successful award. The Veda Trust has substantial assets. Furthermore, there is no evidence that any potentially recoverable assets have been dissipated.

Some parts of the litigation are factually and legally complex while other parts are simple. Most of the discovery has already been done by the attorneys for the two principal creditors. A simple motion for turnover against the Veda Trust would resolve the issue of the applicability of the spendthrift clause. Still, the litigation is likely to be time consuming and expensive and there will certainly be a delay in closing the case.

The paramount interest of creditors is not well served for all the reasons stated previously, including the unfair use of the bankruptcy code to shield assets with overbroad releases and multiple transfers of property between parties to the settlement and entities not party to the settlement. The intricate structure of the settlement reflects the monolithic, seemingly impenetrable nature of the two Trusts and all the related entities; however, boiled down to their essences, these entities appear to be nothing more than alter egos of Debtor I and her two sons.

CPS has voiced its fear that because of the convoluted nature of the settlement and the broad language of the releases, the settlement will likely be used as a defense to CPS's efforts to collect on its nondischargeable judgment post-bankruptcy while also netting CPS only a small dividend in the bankruptcy case. However, CPS has not been able to articulate any specific legal theory as a basis for its fears and discusses only vague consequences of res judicata and collateral estoppel.

Although the settlements would bring monies into the estate, much has been left on the table. Considering all of the evidence presented, the Court finds the settlements concede too much to Debtor I and the Trusts, and the potential dividend to creditors is too small when compared to the potential recovery. Furthermore, a high probability of success in litigation exists with regard to acquiring and liquidating the grain bin operation and the Veda Trust's bequests to Debtor I and the ob-

---

**8.** The Court is mindful that there is always a risk that on appeal the reviewing court might take a different view from this Court and also that the record in support of the motion for compromise is not fully developed.

jection to Debtor I's discharge. These two criteria weigh heavily in favor of rejecting the settlement.

The Court has found that any difficulty in collecting on a recovery is not insurmountable, and this criterion does not outweigh the other two. Additionally, there would be some complexity, expense, inconvenience and delay attending the necessary litigation, but not enough to outweigh the probability of success and fairness to creditors that the Court determines would most likely result from pursuing various causes of action. For all these reasons, the settlement is rejected. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3rd Cir.1996) (rejecting settlement after applying four criteria to determine fairness).

■ The Bankruptcy Trustee only has $1,600.00 with which to finance litigation. (Tr. at 103.) CPS and First National have claims in Debtor I's case totaling more than $3.5 million, representing a substantial portion of the total claims in the case. They hold nondischargeable judgments, and they should be allowed a chance to recover whatever is permitted under state law. The Court has determined that the only alternative is to close the case and let things "fall where they fall...." (Ex. 17, March 12, 2011 letter from Jaffee to Bailey.)

Except for cash on hand, the Bankruptcy Trustee is ordered to abandon all assets in both cases, including all causes of action known or unknown. The Bankruptcy Trustee is also ordered to advise the Court within twenty days of his intent to pursue the objection to Debtor I's discharge or file a motion for voluntary dismissal of the action and give notice to the U.S. Trustee and creditors pursuant to Federal Rule of Bankruptcy Procedure 7041. *See Ballard v. Lindsey (In re Lindsey)*, 208 B.R. 169, 170 (Bankr.E.D.Ark.1997) (upon creditor's

motion to dismiss objection to discharge, trustee was substituted as party plaintiff pursuant to Rule 7041).

IT IS SO ORDERED.